NORTHLAND INSURANCE COMPANY *v.* UNION
PACIFIC RAILROAD COMPANY

92-119                                    830 S.W.2d 850

Supreme Court of Arkansas
Opinion delivered May 11, 1992

*Ponder & Jarboe*, by: *Dick Jarboe*, for appellant.

*Herschel H. Friday* and *Chuck Gschwend*, for appellee.

ROBERT H. DUDLEY, Justice. The Bill J. Smith Trucking Company owned a tractor and trailer that Darrell Carter was driving across the Union Pacific railroad tracks in Walnut Ridge

when the rear of the trailer was struck by the engine of a Union Pacific train. The Smith Trucking Company's insurer, Northland Insurance Company, paid for the loss of the trailer and filed this subrogation claim against Union Pacific. The jury returned a verdict for the defendant railroad. The plaintiff insurance company appeals and argues that the trial court erred in refusing to give two instructions to the jury. The court of appeals certified the case to us. We hold that trial court ruled correctly, and accordingly, we affirm the judgment.

The proof in the case that determined whether the instructions were proper was as follows. Carter was operating a tractor and trailer unit, which was either 74 or 75 feet long, in a westerly direction on State Highway 412 in Walnut Ridge as he approached Union Pacific's dual set of tracks that cross the highway. The tracks run north and south and cross the highway at right angles. Carter was an experienced driver and had driven over this crossing many times. He was familiar with, and to some extent relied upon, the railroad's automatic gates with lights affixed that will lower to stop traffic, and the warning bells and flashing lights that are located next to the highway on both the east and west sides of the dual tracks, but he additionally looked both to the north and to the south and did not see an approaching train. These safety devices are electronically activated by a trigger that is 1,979 feet, or one-third of a mile, from the crossing. At the time he started to cross the tracks, none of the warning devices indicated that he should not do so. He started across slowly because the tracks were rough and because he intended to turn left, or south, onto U.S. Highway 67 at the intersection that was only a short distance past, or west of, the tracks. From the photographs introduced as exhibits at trial, it appears that the intersection is perhaps 50 or 60 feet past the western side of the crossing.

As Carter was crossing the tracks, another long truck approached the intersection from the opposite direction. This second truck, which was facing east, stopped before it reached the railroad tracks because the driver saw the train coming up one of the tracks from the south. The second truck was so long that the back of the trailer blocked part of the intersection behind it and thus prevented Carter from turning left. Carter was "inching" his truck forward and trying to decide how to turn left through the

intersection. The decision was compounded when a car, headed in a southerly direction, stopped at the north side of the intersection, or on Carter's right, leaving Carter, with a 74-foot rig, and apparently only one option, to go straight ahead. Unfortunately, that option was quickly closed when the car on the right entered the intersection and blocked Carter's lane of traffic. At the same time another car, heading north, entered the intersection from the south, went around the back of the second truck, and stopped just short of the car facing south, in Carter's lane of traffic. It is possible that another car was behind Carter, but the testimony concerning it consists of one vague statement. In short, there was gridlock ahead of Carter in the intersection. At that time, Carter heard the warning bells and saw the arm of the gate coming down behind him. He testified that his only options were to drive his tractor into the car that was blocking his lane of traffic and try to push it aside, or inch as close to the car as possible and hope that he was clear of the tracks. He knew that he had cleared the first of the parallel tracks, but was afraid that he had not cleared the second. Facing this Hobson's choice, he chose to inch forward until he was almost touching the car that was in his lane of traffic.

Meanwhile, the brakeman on the train testified that he saw the truck on the tracks about a mile before reaching the crossing, but saw that the truck kept slowly moving forward. He testified that the train was about one-quarter of a mile away from the crossing before he realized the truck was not going to make it across the tracks. The engineer testified that he saw the truck about nine-tenths of a mile from the crossing. He testified that he blew the train's whistle for almost that entire mile and that, at one-third of a mile from the crossing, the truck was still moving. At that point the automatic triggering device activated the warning bells and lights and lowered the crossing gates. He was operating the train at 50 miles per hour, and he thought the truck still had time to get out of the way. At 50 miles per hour it would take the engine 27 seconds to travel the 1,979 feet to the crossing. He testified that he did not realize that the truck would not clear the tracks until the engine was only about one and one-half or two city blocks from the crossing, and he then made an emergency application of the brakes. By that time the result was fated. The train could not be stopped before it reached the crossing, and the traffic jam had locked the truck in the crossing. The emergency

application of the brakes only slowed the train by about 5 miles per hour before it reached the crossing. Because the train was made up of 41 to 43 cars, it would have taken one-half to three-quarters of a mile to completely stop. The train struck the rear part of the trailer, causing the damage that resulted in this case.

Appellant, the company that insured the trucking company against damage to its trailer, first argues that the trial court erred in refusing to give A.M.I. Civil 3d 1802, the instruction about the train crew's failure to keep a lookout. The proffered instruction was as follows:

> All persons operating trains upon any railroad in this state have the duty to keep a constant lookout for property upon, near, or approaching the railroad track. A violation of this duty is negligence.

> This does not mean that each member of the train crew must keep a constant lookout, but it does mean that an efficient lookout must be kept by some member of the crew at all times.

Appellant contends that the trial court erred in refusing the proffered instruction for either of two reasons: First, the evidence warranted it and, second, the credibility of the train's crew was for the jury, not the court, to evaluate. Neither argument has merit. In its first argument, appellant contends that the evidence shows that for almost a mile the train crew observed the truck on the crossing, but did nothing to try to stop the train until it was only one and one-half or two blocks from the crossing. Appellant argues that had the jury been properly charged it could have found that, if the engineer had acted promptly, the train speed could have been reduced more than it was, and that would have given the truck more time to get off the tracks. This argument ignores our established case law concerning the moment at which the duty to take precaution arises for a train crew. In *St. Louis Southwestern Ry. Co. v. Evans*, 254 Ark. 762, 497 S.W.2d 692 (1973), we held that it was error for the trial court to give A.M.I. 1802 when the trainmen were keeping a lookout and the train could not have been stopped in time to avoid the collision after it became apparent that the driver of the car was not going to stop before crossing the tracks. We quoted from *Missouri Pacific R.R. Co. v. Doyle*, 203 Ark. 111, 160 S.W.2d 856 (1942) as

follows:

> The operatives of trains have the right to assume that a traveler or a pedestrian approaching a railroad track will act in response to the dictates of ordinary prudence and the instinct of self-preservation, and will, in fact, stop before placing himself in peril, and the duty of the railroad employees to take precaution begins only when it becomes apparent that the traveler at a crossing will not do so.

*St. Louis Southwestern Ry. Co.* v. *Evans,* 254 at 768, 497 S.W.2d at 695.

Similarly, in this case the train crew had the right to assume that the truck driver would continue to go forward across the tracks, and the duty of the crew to take precautions began only when it became apparent that the truck driver would not get the truck off the tracks. As pointed out in *St. Louis Southwestern Ry. Co.* v. *Evans, supra,* A.M.I. Civil 3d 602 provides:

> Every person using ordinary care has a right to assume, until the contrary is or reasonably should be apparent, that every other person will use ordinary care and obey the law. To act on such assumption is not negligence.

■ Secondly, appellant argues that the trial court should have given the instruction because the only testimony that a proper lookout was kept came from the train crew, and they were interested parties, and the testimony of an interested party is never taken as undisputed. In cases such as this one where the train crew's testimony was corroborated by other witnesses and is not in any manner inconsistent, it is error to give the instruction. *St. Louis Southwestern Ry. Co.* v. *Evans, supra.* Here the train crew testified that they were keeping a proper lookout and from nearly a mile away saw the truck inching along. The truck driver corroborated the fact that he was slowly inching forward at the time the train crew should have first seen him. There were no facts inconsistent with this testimony. Thus, it would have been error to give the instruction. The case relied on by appellant, *Missouri Pacific R.R. Co.* v. *Thomas,* 197 Ark. 565, 124 S.W.2d 820 (1939), is distinguished by its facts. There, the plaintiff sued the railroad for the death of her husband who was walking along the

tracks when he was struck by the train. The engineer testified that he was keeping a lookout but did not see the decedent until the train was within 450 or 500 feet of him. This testimony was not corroborated by independent testimony and, in addition, the plaintiff put on evidence that the decedent could have been seen for a distance of 1,000 feet or more from the point of impact.

Appellant next assigns as error the trial court's refusal to give an instruction patterned on A.M.I. Civil 3d 1805 which would have set out the railroad's duty "to give a warning reasonably sufficient to permit the traveling public to use the crossing with reasonable safety." *Id.* Again, the trial court ruled correctly in refusing to give the instruction.

The general rule is that a railroad company is not under a duty to provide warning devices at a crossing, and therefore, a failure to do so is not negligence per se. However, when there is evidence which tends to show that the crossing is "abnormally dangerous," it is for the jury to decide whether the crossing is in fact "abnormally dangerous" and, if so, whether the railroad breached its "duty to use ordinary care to give a warning reasonably sufficient to permit the traveling public to use the crossing with reasonable safety." A.M.I. Civil 3d 1805. In *Missouri Pacific R.R. Co.* v. *Biddle*, 293 Ark. 142, 732 S.W.2d 473 (1987), we reviewed most of our abnormally dangerous crossing cases and adopted a totality of the circumstances standard for determining when a crossing is abnormally dangerous and when warning devices should be installed, but in this case warnings already had been installed. Even assuming the evidence showed that the crossing was abnormally dangerous, there was no showing that the warning devices that had been installed were inadequate. Thus, the trial court did not err in refusing to give the instruction. To the contrary, the instruction should be given when there is a warning device at an abnormally dangerous crossing, and there is proof tending to show that the warning device is inadequate under the circumstances. *St. Louis Southwestern Ry. Co.* v. *Jackson, Adm'r*, 242 Ark. 858, 876, 416 S.W.2d 273, 283 (1967).

Affirmed.