UNION PACIFIC RAILROAD COMPANY and T.P. Spoon
*v.* Jonathan SHARP and Aristea Sharp

96-1096 952 S.W.2d 658

Supreme Court of Arkansas
Opinion delivered October 9, 1997

[Petitions for rehearing denied November 13, 1997.*]

---

\* Both appellants and appellees filed petitions for rehearing.

*William H. Sutton, Frederick S. Ursery , Scott H. Tucker, & Clifford W. Plunkett,* for appellants.

*Epley, Epley & France, Ltd.,* by: *Lewis E. Epley, Jr.* and *Tim S. Parker,* for appellees.

*Arkansas Trial Lawyers Association,* by: *Henry C. Kinslow,* amicus curiae.

*Barrett & Deacon,* by: *J.C. Deacon* and *D.P. Marshall, Jr.,* amicus curiae, for Association of American Railroads, on cross-appeal.

ANNABELLE CLINTON IMBER, Justice. This is a negligence action involving a collision at a railroad crossing in Marianna. The appellants, Union Pacific Railroad Company and T.P. Spoon ("the railroad"), appeal a jury verdict rendered against them. The appellees, Jonathan and Aristea Sharp ("Sharp"), cross-appeal the trial court's entry of partial summary judgment in favor of the railroad on the issue of whether the railroad placed adequate warning devices at the crossing. We reverse the jury verdict, and affirm the partial summary judgment.

On February 15, 1993, Jonathan Sharp was driving a van owned by his mother, Aristea Sharp, when he collided with a Union Pacific train at the Louisiana Street railroad crossing in

Marianna. The accident occurred in the afternoon, and the streets were wet from an earlier rain. Union Pacific's train was being pulled by two locomotives. The lead locomotive was operated by engineer T.P. Spoon who was on the right side of the train and brakeman Steve Tyler who was on the left side of the train where the impact occurred. The second locomotive was unoccupied. The only warning device at the railroad crossing was a single crossbuck[1] which was installed in the early 1980's pursuant to a safety program funded by the federal government.

Sharp filed a negligence action against the railroad alleging that it failed to place adequate warning devices at the crossing, failed to maintain the warning devices, failed to properly sound audible warnings, and failed to keep a proper lookout for vehicles entering the crossing.[2] Prior to trial, the court granted the railroad partial summary judgment on the issue of whether it placed adequate warning devices at the crossing because it found that the claim was preempted by federal law. The case proceeded to trial on Sharp's remaining negligence theories.

At trial, Sharp admitted that he was aware of the railroad crossing because he had passed over it four or five times the day of the accident. Sharp, however, claimed that he did not know that a train was entering the crossing at the time of the accident because his view was obstructed, and the train failed to sound its audible warning devices. Sharp further explained that he applied his brakes when he saw the train approximately sixty-two feet from the crossing, but that he was unable to stop before the front end of his van collided with the left side of the train. In contrast, the train operators testified that they sounded the whistle in a series of two long, one short, and one long blasts, and that they were unable to see Sharp's vehicle prior to impact.

---

[1] A "cross-buck" is an x-shaped highway warning sign placed at a railroad crossing. *Webster's New International Dictionary* 541 (3d 1968).

[2] Sharp claimed that the railroad was negligent in several other respects which are not relevant to this appeal.

*Direct Appeal*

## I. Sufficiency of the Evidence

■ For its first argument on appeal, the railroad asserts that the trial court erred when it denied its motion for a directed verdict on Sharp's negligence claim. Our standard of review of the denial of a motion for a directed verdict is whether the jury's verdict is supported by substantial evidence. *Ouachita Wilderness Institute, Inc. v. Mergen,* 329 Ark. 405, 947 S.W.2d 780 (1997); *Balentine v. Sparkman,* 327 Ark. 180, 937 S.W.2d 647 (1997). Substantial evidence is defined as "evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond suspicion or conjecture." *Esry v. Carden,* 328 Ark. 153, 942 S.W.2d 846 (1997). When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.* In such situations, the weight and value of testimony is a matter within the exclusive province of the jury. *Id.*

■ To establish a *prima facie* case of negligence, a plaintiff must show that damages were sustained, that the defendant breached the standard of care, and that the defendant's actions were the proximate cause of the damages. *See Ouachita Wilderness, supra; Southern Farm Bureau Casualty Ins. v. Allen,* 326 Ark. 1023, 934 S.W.2d 527 (1996). The parties do not contest that Sharp suffered damages as a result of the collision. Hence, the relevant inquiry on appeal is whether Sharp presented substantial evidence that the railroad breached the standard of care, and that this breach was the proximate cause of his damages.

### A. Breach of the Standard of Care

At trial, Sharp argued that the railroad was negligent in failing to keep a proper lookout and failing to properly sound its audible warnings. Because the jury rendered a general verdict of negligence, it is impossible to determine whether the jury found that the railroad was negligent in one or both respects. Hence, we must affirm if there is sufficient evidence to support either theory of negligence.

■ Sharp's first theory of negligence was that the railroad failed to maintain a proper lookout under Ark. Code Ann. § 23-12-907(a)(1) (1987) which states that:

> It shall be the duty of all persons running trains in this state upon any railroad to keep a constant lookout for all persons, including 'licensees and trespassers, and property upon the track of any and all railroads.

During Sharp's case-in-chief, the train's engineer, T.P. Spoon, testified that he could not see Sharp's van, and that he did not know that the train had struck the van until the brakeman brought it to his attention. We find that from this testimony, a jury could have concluded that the railroad breached the standard of care by failing to keep a proper lookout for vehicles entering the Louisiana Street crossing. Because we find that Sharp presented substantial evidence that the railroad was negligent in failing to maintain a proper lookout, it is unnecessary to address whether he presented substantial evidence that the railroad was also negligent in failing to properly sound its audible warnings.

### B. Proximate Causation

■ The railroad next argues that the trial court should have granted a directed verdict because there was insubstantial evidence that the railroad's negligence was the proximate cause of Sharp's injuries. We have previously defined proximate cause as "that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *Ouachita, supra; Craig v. Traylor*, 323 Ark. 363, 915 S.W.2d 257 (1996). Proximate causation is usually an issue for the jury to decide, and when there is evidence to establish a causal connection between the negligence of the defendant and the damage, it is proper for the case to go to the jury. *Ouachita, supra; Tyson Foods Inc. v. Adams*, 326 Ark. 300, 930 S.W.2d 374 (1996); *McGraw v. Weeks*, 326 Ark. 285, 930 S.W.2d 365 (1996). In other words, proximate causation becomes a question of law only if reasonable minds could not differ. *Ouachita, supra; Tyson, supra.*

■■ ˙ As mentioned previously, Sharp presented evidence that the railroad might have been negligent in failing to keep a proper lookout. The jury could have concluded that if the railroad had kept a proper lookout, it could have either stopped prior to colliding with Sharp's van or sounded earlier warnings to notify Sharp of the impending danger. The railroad argues that Archie Burnham's testimony unequivocally established that the train could not have stopped when it was first able to see Sharp's vehicle. We, however, have previously explained that the jury is not bound to accept the opinion testimony of experts as conclusive. *Dixon Ticonderoga Co. v. Winburn Title Mfg. Co.*, 324 Ark. 266, ·920 S.W.2d 829 (1996); *Burns v. State*, 323 Ark. 206, 913 S.W.2d 789 (1996); *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1996), *cert. denied*, 116 S. Ct. 1861 (1996). Hence, we find that Sharp presented substantial evidence of a causal connection between his damages and the railroad's actions.

In reaching this conclusion, we are not unmindful of our prior decisions where we held that it was improper to give the lookout instruction where the evidence established that the train could not have stopped in time to avoid the collision. *Northland Ins. Co. v. Union Pacific R.R.*, 309 Ark. 287, 830 S.W.2d 850 (1992); *St. Louis Southwestern Ry. v. Evans*, 254 Ark. 762, 497 S.W.2d 692 (1973). These cases, however, are distinguishable from the case at hand in that the appellants in both *Northland* and *Evans* contested the court's decision to give a jury instruction on one particular theory of negligence. *Northland, supra; Evans, supra.* Although the railroad also objected to the lookout instruction in this case, it has failed to contest this ruling on appeal. Instead, the railroad has merely asked us to determine whether there was substantial evidence to support the jury's general verdict of negligence which, as previously mentioned, could have been based upon the jury's finding that the train was negligent in failing to sound audible warnings, in failing to keep a proper lookout, or both. In other words, we are asked only to determine if there was any showing of proximate cause, and not whether the plaintiff established proximate cause of a particular theory of negligence.

■ For these reasons, we find that Sharp presented substantial evidence that the railroad breached its standard of care, and

that this breach was the proximate cause of Sharp's injuries. Accordingly, we affirm the trial court's decision to submit the case to the jury for resolution.

## II. The Sudden Emergency Instruction

For its next argument on appeal, the railroad asserts that the trial court erred when it gave the Sudden Emergency instruction which states:

> A person who is suddenly and unexpectedly confronted with danger to himself or others not caused by his own negligence is not required to use the same judgment that is required of him in calmer and more deliberate moments. He is required to use only the care that a reasonably careful person would use in the same situation.

AMI Civ. 3rd 614.

In *Wiles v. Webb*, 329 Ark. 108, 946 S.W.2d 685 (1997), we recently abolished the use of the Sudden Emergency instruction in all *future* cases because we found that the instruction was inherently confusing. The *Wiles* holding applies prospectively only, and thus is inapplicable to cases, such as this one, that were tried before the *Wiles* decision was handed down on June 16, 1997. In these "pre-*Wiles*" cases, we will apply the old rule that the Sudden Emergency instruction may not be given where there is any evidence that the party requesting the instruction was negligent in creating the emergency situation. *Thomson v. Littlefield*, 319 Ark. 648, 893 S.W.2d 788 (1995); *Druckenmiller v. Cluff*, 316 Ark. 517, 873 S.W.2d 526 (1994).

Sharp claims that this issue is not preserved for appeal because the railroad failed to make a proper objection to the instruction. It is well settled that no party may assign as error the giving or failure to give an instruction unless he objects thereto before or at the time the instruction is given, stating distinctly the matter to which he objects and the grounds of his objection. *Bridges v. State*, 327 Ark. 392, 938 S.W.2d 561 (1997); *Clowney v. Gill*, 326 Ark. 253, 929 S.W.2d 720 (1996). We find that the railroad complied with these requirements when it objected as follows:

> SHARP: I have a 614 instruction on sudden emergency. It does appear that that was what occurred out there.
>
> RAILROAD: Judge, the notes on 614 say one has to be free from negligence to be entitled to this instruction.
>
> COURT: Just thinking on this — I don't know how the Judge can be put in the position of making that decision because that is a question of fact for the jury.
>
> RAILROAD: Well the law as we will get to, and I think its 1804 is: A railroad grade crossing is a place of danger. And the witness himself testified that he knew there was a railroad crossing ahead, and he saw it when he turned the corner and also he had been across it four of five times that same day. He wasn't suddenly and unexpectedly confronted with the danger of a railroad crossing.

▇▇ The railroad's initial objection was a verbatim recitation of the notes commenting on AMI 614. *See Williams v. Carr*, 263 Ark. 326, 565 S.W.2d 400 (1978). After the trial court expressed its understanding that only the jury can decide whether Sharp was free from negligence, the railroad enumerated evidence of Sharp's negligence, thereby apprising the trial court that the instruction should not be given because there was evidence that Sharp was negligent in creating the emergency situation. Only after considering the railroad's references to evidence of Sharp's negligence did the trial court overrule the objection. Hence, we find that the issue is properly preserved for appeal.

As to the merits, we agree with the railroad that the instruction should not have been given under the "pre-*Wiles*" rule because there was some evidence from which a jury could have concluded that Sharp was negligent in creating the emergency situation. For example, Sharp testified that he was aware of the crossing because he had passed over it several times that day. Additionally, Sharp admitted that he saw the train as it turned the corner to the intersection. Sharp also did not have a valid driver's license at the time of the accident. Finally, there was some evidence that Sharp may have been driving too fast for the wet road conditions.

▇▇ Because there was some evidence that Sharp was negligent in causing the impending collision, we conclude that the

trial court erred when it gave the Sudden Emergency instruction. Accordingly, we reverse the trial court's ruling on this issue.

### III. Closing Arguments

At the close of all evidence, the railroad moved for a directed verdict on the issue of whether it failed to sound audible warnings in a manner required by law. This is merely another theory of how the railroad was negligent in causing the collision. As we have previously ruled, there was sufficient evidence to support the jury's general verdict of negligence, and thus it is unnecessary for us to determine whether there was sufficient evidence of this particular theory of negligence. The railroad, however, raised this issue again during Sharp's closing argument.

At the conclusion of all evidence, the judge gave the jury the following instruction which is based upon Ark. Code Ann. § 23-12-410 (1987):

> A railroad is required to place on each locomotive a bell or whistle, and these shall be rung or whistled at a distance of at least a quarter mile from where the tracks cross any public street and shall be kept ringing or whistling until the locomotive has crossed the street.

AMI Civ. 3d § 1801. The judge also gave AMI Civ. 3d § 101 which informs the jury that opening statements, closing arguments, and statements made by the attorneys during the trial are not evidence.

During his closing argument, Sharp began to read AMI Civ. 3d § 1801 when the railroad objected stating that the statute does not say that each locomotive has to sound the warnings. At that point, Sharp had done nothing more than read the jury instruction, and thus we cannot say that he mischaracterized the law in any way. Sharp resumed his closing argument by reading the instruction again and then stating:

> It doesn't say they can pause one to three seconds in their whistling sequence. It says they shall be kept ringing and whistling. Mr. Spoon himself testified that he paused. Mr. Sain testified that there was pause in the blowing sequence. Mrs. Sain testified that there was pause in this blowing sequence. They

> were breaking the law coming down this track blowing that whistle like that. Mr. Spoon also testified that there were two engines on that train. He testified that only one had horns, whistles and bells working. They had one — at least one of the locomotives was out there without the proper equipment. They were breaking the law when they did that.

The railroad objected stating that Sharp had mischaracterized the law because the standard practice in the industry is to blow the whistle in a series of blasts, and that under federal law two engines together are defined as one locomotive. The railroad, however, did not ask for a mistrial or for a limiting instruction.

In *Jordan v. State*, 323 Ark. 628, 917 S.W.2d 164 (1996), we held that in order to preserve this issue for appeal, the attorney must ask for and be denied affirmative relief such as a mistrial or a limiting instruction. (citing *Littlepage v. State*, 314 Ark. 361, 863 S.W.2d 276 (1993)). In this case, the railroad did neither, nor did it ask the court to instruct the jury on the federal definition of locomotives or the method by which the train must sound its whistle. Hence, we find that the issue is not properly preserved for appeal.

For these reasons, we reverse and remand on the railroad's direct appeal.

## Cross-Appeal

### A. Failure to Place Adequate Warning Devices

On cross-appeal, Sharp argues that the trial court erred when it found that Sharp's claim that the railroad failed to place adequate warnings at the crossing was preempted by federal law. We find no error in the trial court's ruling, and accordingly we affirm the entry of summary judgment on this issue.

In 1970, Congress passed the Federal Railroad Safety Act which directed the Secretary of Transportation to study and develop solutions to safety problems created by railroad crossings. 45 U.S.C. §§ 421 to 447. Based on the Secretary's report and suggestions, Congress passed the Highway Safety Act of 1973. 23 U.S.C. § 130. This Act made federal funds available to states to

improve railroad crossings, in return for which the states were required to:

> conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose.

23 U.S.C. § 130(d). In 1975, the Federal Highway Administration (FHWA) promulgated regulations that determined the states's eligibility for the federal funds provided by the Highway Safety Act. Of particular importance to this case, is 23 C.F.R. § 646.214(b)(3) which states that automatic gates with flashing signals must be installed if one or more of certain listed conditions exist[3]. The regulation also provides that:

> For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of the FHWA.

23 C.F.R. § 646.214(b)(4).

Pursuant to the Highway Safety Act, the Arkansas State Highway and Transportation Department and Union Pacific's predecessor became involved in a state-wide project to upgrade railroad crossings throughout the state. The state plan included a determination that two crossbucks should be placed at all railroad crossings in the state, including the Louisiana Street crossing in Marianna. On January 4, 1980, the FHWA approved the state plan and subsequently entered into a contract to pay for 90% of

---

[3] The conditions listed in 23 C.F.R. § 646.214(b)(3) include: 1) multiple main line railroad tracks; 2) multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing; 3) high speed train operation combined with limited sight distance at either single or multiple crossings; 4) a combination of high speeds and moderately high volumes of highway and railroad traffic; 5) either a high volume of vehicular traffic, high number of train movements, substantial numbers of school buses or trucks carrying hazardous materials, unusually restricted sight distances, continuing accident occurrences, or any combination of these conditions; or 6) a diagnostic team recommends them.

the improvements. On March 3, 1981, the FHWA inspected and approved the completed improvements, and made final payment to the state on March 22, 1988.

The issue presented by this cross-appeal is whether federal funding of the improvements at the Louisiana crossing pursuant to the Highway Safety Act preempted Sharp's claim that the railroad was negligent in failing to install adequate warning devices. It is uncontested that according to 23 C.F.R. § 646.214(b) automatic gates and flashing lights are required only if one or more of the conditions listed in 646.214(b)(3) exist at a particular crossing. The ultimate issue in this case is what kind of federal participation triggers federal preemption under the Highway Safety Act.

Sharp argues that preemption occurs only when a diagnostic team has determined whether the 646.214(b)(3) conditions exist at a particular crossing. Because a diagnostic team did not evaluate the Louisiana Street crossing, Sharp contends that the federal government has not made a final determination in this respect, and thus it is proper to submit the issue to a jury for resolution.

In contrast, the railroad asserts that, by providing federal funds, FHWA determined that the State Highway Department's plan for the installation of crossbucks at the Louisiana Street crossing was adequate. Hence, the railroad argues that once federal funds have been spent to upgrade a railroad crossing, negligence claims such as Sharp's are preempted. We agree with the railroad's position, and accordingly we affirm the trial court's ruling.

The United State Supreme Court first addressed the preemptive effect of the Highway Safety Act and its regulations in *CSX Transportation Inc. v. Easterwood*, 507 U.S. 658 (1993). In *Easterwood*, the plaintiff claimed that the railroad was negligent in failing to place adequate warning devices at a railroad crossing where her husband was killed. *Id.* As in this case, the railroad argued that the claim was preempted by the federal act and supporting regulations. *Id.* The Supreme Court explained that negligence actions are preempted by the act because 23 C.F.R. §§ 646.214(b)(3) and (4) remove the railroad's decision-making authority to determine what type of warning devices are needed at a particular crossing. *Id.* The Court concluded that:

for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.

*Id.* Because federal funds were not expended to improve the railroad crossing in *Easterwood*, the Court found that the plaintiff's tort claim was not preempted.

After *Easterwood*, it was disputed whether preemption is triggered by the mere use of federal funds to improve a crossing or whether greater federal participation is required. In *Shots v. CSX Transportation, Inc.*, 38 F.3d 304 (7th Cir. 1994), the Seventh Circuit Court of Appeals refused to read *Easterwood* "literally," and held that the Secretary's mere funding of the installation of crossing devices did not necessarily imply federal approval of the state's determination of what warning devices were required at each crossing. *Id.* Instead, the Seventh Circuit suggested that preemption would occur only when there was greater federal participation such as the completion of an evaluation of the crossing in question by a diagnostic team.

The remaining federal circuit courts of appeal that have addressed this issue, have rejected the *Shots* holding, and have held that by providing funds the federal government has implicitly approved the states' improvement plans and their determinations of whether a particular crossing requires automatic gates and lights under 23 C.F.R. § 646.214(b)(3). *Armijo v. Atchison, Topeka, & Santa Fe Ry.*, 87 F.3d 1188 (10th Cir. 1996); *Michael v. Norfolk S. Ry.*, 74 F.3d 271 (11th Cir. 1996); *Hester v. CSX Transp., Inc.*, 61 F.3d 382 (5th Cir. 1995). As stated by the Fifth Circuit Court of Appeals in *Hester*, these courts find that:

> The fact that federal funds participated in the installation of the warning devices legally presupposes that the Secretary approved and authorized the expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task.

*Hester, supra.*

 Likewise, the Eighth Circuit Court of Appeals has consistently held that once warning devices paid for with federal funds are installed and operating, the railroad's common-law duty of care ceases, and it is entitled to the benefit of federal preemption. *Kiemele v. Soo Line R.R.*, 93 F.3d 472 (8th Cir. 1996); *Elrod v. Burlington Northern R.R.*, 68 F.3d 241 (8th Cir. 1995); *St. Louis Southwestern Ry. v. Malone Freight Lines, Inc.*, 39 F.3d 864 (8th Cir. 1994). *See also Dallari v. Southern Pac. R.R.*, 923 F. Supp. 1139 (E.D. Ark. 1996); *Cartwright v. Burlington N. R.R.*, 908 F. Supp. 662 (E.D. Ark. 1995).

In response, Sharp directs our attention to *Williams v. Burlington N. R.R.*, 849 F. Supp 682 (E.D. Ark. 1994), where the district court held that preemption does not occur unless federal funds are expended *and* a diagnostic team has determined what warning devices are adequate for the crossing in question. The *Williams* case, however, was decided before the Eighth Circuit first spoke on this issue in *Malone*, and thus we find it unpersuasive.

We agree with the Eighth Circuit that, "federal funding is the touchstone of preemption in this area because it indicates that the warning devices have been deemed adequate by federal regulators." *Elrod; supra.* We find that such a holding is consistent with Section 109 of the Highway Safety Act which declares that no funds shall be approved for expenditure by the FHWA unless "proper safety protective devices complying with safety standards determined by the Secretary at that time as being adequate shall be installed or be in operation at any highway and railroad crossing." 23 U.S.C. § 109(e). Moreover, 23 C.F.R. § 630.114(b) declares that the FHWA can authorize a project "only after applicable prerequisite requirements of Federal laws, and implementing regulations and directives have been satisfied."

Finally, we do not agree with Sharp's contention that the *Hester* and *Elrod* decisions are distinguishable because it was undisputed that the crossings did not contain the conditions listed in (b)(3). We find that such an analysis begs the question presented by this case. As we have previously explained, whether the conditions listed in (b)(3) exist at a particular crossing is for the FHWA,

not a jury, to decide. Once the FHWA has spoken on the issue by providing federal funds for a state improvement project, the determination of whether (b)(3) conditions exist has already been made, and it may not be revisited by the state courts.

For these reasons, we follow the Eighth Circuit's interpretation of *Easterwood* and hold that once warning devices paid for with federal funds are installed and operating, the railroad's common–law duty to determine what warning devices are adequate for a particular crossing ceases, and it is entitled to the benefit of federal preemption. In this case, the Arkansas State Highway Commission determined that in the interest of safety two crossbuck warning signs should be installed at every railroad crossing in Arkansas, including the Louisiana Street crossing in Marianna. When the FHWA paid for the installation of these crossbucks, it implicitly determined that such safety devices were adequate to their task pursuant to 23 C.F.R. §§ 109(e), 630.114(b), and 646.214(b). Accordingly, we affirm the trial court's ruling that Sharp's claim that the railroad failed to place adequate warning devices at the crossing is preempted by federal law.

The dissent argues that such a holding is contrary to public policy because federal preemption will "provide blanket immunity to the railroad when proof that conditions have changed over time was offered at trial." This argument, however, ignores the fact that the regulations promulgated by the FHWA have stripped the railroad of any decision–making authority to determine what type of warning devices are needed at a particular intersection, and placed such authority in the FHWA. *See Easterwood, supra.* As later acknowledged in the dissent, any failure to monitor the changing nature of an intersection thus must be attributable to a "break down" in the federal system.

Moreover, the dissent suggests that preemption is not absolute, and that at some undeterminable point preemption disappears and the railroad's authority to determine what type of warning devices are needed is mysteriously resurrected. We, however, do not agree that federal preemption can be a revolving door. Rather, we find that federal premption is absolute once fed-

eral funds have been expended to implement the installation of warning devices at a particular intersection.

### B. Failure to Maintain Warning Devices

■ Finally, Sharp alleges that the trial court erred when it granted the railroad a directed verdict on his claim that the railroad was negligent in failing to maintain the crossbucks at the Louisiana Street crossing. Sharp is correct that the Highway Safety Act does not preempt claims that a railroad was negligent in failing to maintain warning devices at a crossing. *See, e.g., Michael v. Norfolk S. Ry.*, 74 F.3d 271 (11th Cir. 1996); *Kiemele v. Soo Line R.R.*, 93 F.3d 472 (8th Cir. 1996). As explained by the court in *Michael*, 23 C.F.R. § 646.214(b) "deals with the design and installation of new warning devices, not the maintenance of those devices." *Michael, supra.* Thus, while the Highway Safety Act preempts a claim that the railroad failed to install adequate warning devices, it does not preempt a claim that the railroad was negligent in failing to maintain the warning devices implicitly approved by the FHWA.

Moreover, we disagree with the dissent's assertion that there is "a very thin line" between these two types of claims. As previously explained, federal preemption strips the railroad of its decision-making authority as to what types of warning devices are needed at a particular intersection. Preemption, however, does not relieve the railroad of its separate and distinct duty to maintain the warning devices. We find the line between these two types of claims to be clear and distinct.

■ During oral argument, Sharp asserted that the trial court precluded him from presenting any evidence that the railroad was negligent in failing to maintain the crossbucks at the Louisiana Street crossing. The abstract, however, is devoid of any such ruling. Moreover, after the railroad moved for a directed verdict on this issue, Sharp proclaimed:

> It has been my assumption that [the claim that the railroad was negligent in failing to maintain the warning devices] was part of the preemption, your Honor, and that's the reason I didn't try to put on any proof.

We agree with Sharp's admission that he failed to present any proof that the railroad was negligent in this respect. Accordingly, we affirm the trial court's ruling.

For these reasons, we reverse and remand on the railroad's direct appeal, and affirm on Sharp's cross-appeal.

BROWN, J., concurring in part and dissenting in part.

ROBERT L. BROWN, Justice, concurring in part; dissenting in part. I agree with the majority opinion on direct appeal but dissent from the majority's conclusion on cross-appeal.

The issue on cross-appeal is whether federal funds used to pay for two crossbuck signs at a railroad crossing in Marianna in 1981 shields the railroad from all liability for what plaintiffs contend became an abnormally dangerous railroad crossing 12 years later. A subsidiary issue is whether this immunity exists for the railroad even when no survey of the crossing has been made by a diagnostic team during this 12-year period. I do not read the *dictum* in *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658 (1993), to provide blanket immunity to the railroad when proof that conditions have changed over time was offered at trial and when there has been no proof of monitoring by any government agency during the 12-year period. Otherwise, the federal government could pay for one crossbuck sign and protect the railroad from liability for decades. That defies common sense and is contrary to public policy.

The common law in Arkansas provides that where there is evidence to show that a railroad crossing is abnormally dangerous, that becomes a jury question. A jury must then decide whether the railroad breached its duty of ordinary care to give a warning reasonably sufficient to permit the traveling public to use the crossing with reasonable safety. *Northland Ins. Co. v. Union Pac. R.R. Co.*, 309 Ark. 287, 830 S.W.2d 850 (1992); *Missouri Pacific R.R. Co. v. Biddle*, 293 Ark. 142, 732 S.W.2d 473 (1987); A.M.I. CIVIL 3d 1805. In *Northland Ins. Co.*, we stated that AMI 1805, relating to the railroad's duty at abnormally dangerous crossings, should be given when there is proof tending to show the warning devices are inadequate.

The majority opinion hinges its conclusion on *CSX Transp. Inc. v. Easterwood, supra,* but, again, that case does not resolve the issue before this court. In *Easterwood,* the Court stated that when federal regulations relating to warning devices are applicable, state tort law is preempted. Those regulations read:

(3)(i) *Adequate warning devices,* under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

(A) Multiple main line railroad tracks.

(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.

(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

(F) A diagnostic team recommends them.

(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.

(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

23 CFR §§ 646.214(b)(3) and (4).

In *Easterwood,* the Court concluded that the regulations did not apply due to lack of federal participation in paying for the warning devices. Thus, preemption did not occur. The opinion, in addition, did not confront the critical issue in this case — does

preemption occur more than a decade later when there is proof that conditions have changed at the crossing and no diagnostic team has reevaluated the crossing? Without clear direction in *Easterwood* that preemption occurs even when proof is offered that compliance with federal regulations has not transpired, I am reluctant to convey blanket immunity on the railroad.

The other cases cited by the majority, while endorsing a principle of general preemption, also fail to come to grips with and discuss the precise issue raised in the case at hand. *See Kiemele v. Soo Line R.R.*, 93 F.3d 472 (8th Cir. 1996); *Aronijo v. Atchison, Topeka & Santa Fe Ry.*, 87 F.3d 1188 (10th Cir. 1996); *Michael v. Norfolk S. Ry.*, 74 F.3d 271 (11th Cir. 1996); *Elrod v. Burlington Northern R.R.*, 68 F.3d 241 (8th Cir. 1995); *Hester v. CSX Transp., Inc.*, 61 F.3d 382 (5th Cir. 1995); *St. Louis Southwestern Ry. v. Malone Freight Lines, Inc.*, 39 F.3d 864 (8th Cir. 1994); *Dallari v. S. Pac. R.R.*, 923 F. Supp. 1139 (E.D. Ark. 1996); *Cartwright v. Burlington N. R.R.*, 908 F. Supp. 662 (E.D. Ark. 1995). That issue is does preemption occur when the federal system has broken down and monitoring by diagnostic teams has failed to take place. To maintain the fiction under such circumstances that the initial federal funding of a crossbuck sign presupposes a finding by the Secretary of Transportation that the crossing is still safe seems particularly ludicrous.

Furthermore, in *Kiemele v. Soo Line R.R., supra*, the Eighth Circuit stated that there was a fact question relating to whether the crossbuck signs were "operating" or whether they had lost their reflectivity. If the crossbuck signs were not operating, the Eighth Circuit opined that the railroad was not entitled to federal preemption. It seems to me to be a very thin line indeed between failure of crossbuck signs to reflect properly and the inadequacy of passive crossbuck signs as a warning device altogether. Along the same line is the case of *Michael v. Norfolk S. Ry., supra*. There, the installed warning gate was arguably shorter than what federal regulations required. The Eleventh Circuit noted that this lapse, if proven, would void any claim for preemption. Both *Kiemele* and *Michael* stand for the proposition that federal preemption may not occur under the facts of individual cases.

Both the Seventh Circuit Court of Appeals and two decisions by the Federal District Court for the Eastern District of Arkansas have found that blanket federal preemption does not occur under *CSX Transp., Inc. v. Easterwood, supra. See Shots v. CSX Transp., Inc.*, 38 F.3d 304 (7th Cir. 1994); *Birmingham v. Union Pacific R.R. Co.*, No. PB-C-96-573 (E.D. Ark. June 18, 1997); *Williams v. Burlington Northern R.R. Co.*, 849 F. Supp. 682 (E.D. Ark. 1994). In *Shots*, the fiction that the Secretary of Transportation approved the warning devices at the crossing at issue is taken to task. Regulations b(3) and (4), according to the Seventh Circuit, merely set out criteria and not what was required at the particular crossing at issue. The two district court opinions (*Williams* and *Birmingham*) emphasize that there was inadequate proof that a diagnostic team had evaluated the pertinent crossings. This lapse in evaluation of the crossings raised a material issue of fact regarding whether preemption ever occurred which precluded summary judgment in both instances.

In the instant case, the Sharps presented proof of noncompliance with federal regulations which should at the very least raise a fact issue regarding the application of preemption of state common law and immunity for the railroad. That proof included not only the fact that one crossbuck sign on Sharp's side of the tracks was inadequate but also proof of the following b(3) conditions that would require a gate and flashing lights:

- multiple tracks

- high volume of vehicular traffic

- number of school buses

- no diagnostic team evaluation.

There was also proof that multiple accidents had occurred at this precise crossing. Surely, this proof of inadequacy was sufficient to thwart summary judgment.

There is, finally, the point that with such full-blown immunity, there is no incentive for Union Pacific to measure safety at railroad crossings. The majority opinion concludes that federal preemption is absolute even when federal safety regulations are not followed and that the railroads of this land have been "stripped" of

all decision-making authority concerning safety at railroad crossings. I cannot go that far because federal regulations and *CSX Transportation, Inc. v. Easterwood, supra,* do not contemplate that the railroad is out of the picture altogether or immune from liability when the federal system fails to operate. The Court made that clear in *Easterwood*:

> Indeed, §§ 646.214(b)(3) and (4) effectively set the terms under which railroads are to participate in the improvement of crossings. The former section envisions railroad involvement in the selection of warning devices through their participation in diagnostic teams which may recommend the use or nonuse of crossing gates. §§ 646-214(b)(3)(i)(F) and (3)(ii). Likewise, § 646.214(b)(4), which covers federally funded installations at crossings that do not feature multiple tracks, heavy traffic, or the like, explicitly notes that railroad participation in the initial determination of "the type of warning device to be installed" at particular crossings is subject to the Secretary's approval.
>
> . . . .
>
> The Secretary's regulations therefore cover the subject matter of the state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.

*Easterwood*, 507 U.S. at 670-71.

What is contended in the instant case is that the diagnostic team, with railroad participation, has failed to evaluate a dangerous crossing in Marianna, and proof was provided to support that contention. Far from my advocating a "revolving door" on preemption, when the federal apparatus has broken down, preemption simply does not occur. Otherwise, the public is protected neither by federal law nor common law tort. It is beyond dispute that the intention of the Secretary of Transportation in adopting the regulations was not to leave the traveling public vulnerable and without any mechanism to assure safety.

I respectfully dissent from the affirmance of summary judgment on cross-appeal.