## DIXON TICONDEROGA COMPANY *v.* WINBURN TILE MANUFACTURING COMPANY

95-812                                920 S.W.2d 829

Supreme Court of Arkansas
Opinion delivered April 29, 1996
[Petition for rehearing denied June 3, 1996.*]

---

*DUDLEY, J., not participating.

*Allen Law Firm*, by: *H. William Allen*, for appellant.

*Williams & Anderson*, by: *Leon Holmes, Katharine R. Cloud* and *John E. Tull*, for appellee.

TOM GLAZE, Justice. Winburn Tile Manufacturing Company filed this lawsuit against Dixon Ticonderoga Company, alleging negligence, breach of express and implied warranty and deceit in the sale of products called saggers. A sagger is a type of open-top box used in the manufacturing process of tile. Specifically, newly pressed tile is placed in saggers that are then stacked on small rail-type cars that ride on a track through a kiln where extreme heat is applied to glaze the tile. Because saggers must endure shifts in temperatures from around 2300 degrees to room temperature

within a twenty-four-hour period, their life span is limited.

At trial, Winburn Tile offered proof in its attempt to show Dixon had intentionally misrepresented that its saggers were manufactured with a PT-250 formula, when, in fact, another mix, PT-250A, was being used. Winburn Tile contended that Dixon's pattern of fraudulent concealment injured Winburn in the sum of $99,682.45. The jury agreed, awarding compensatory damages in the full amount requested. The jury also awarded Winburn Tile punitive damages in the same amount. On appeal, Dixon claims the trial court erred in (1) submitting punitive damages to the jury and (2) refusing to grant a new trial due to an erroneous verdict for compensatory damages.

In its first argument, Dixon grudgingly concedes that, given this court's standard of review, Winburn Tile's evidence at trial was sufficient to prove its allegations of deceit. Nevertheless, Dixon argues deceit, alone, is insufficient to justify the imposition of punitive damages; it urges Winburn tile also had to show Dixon knew its deceit or misrepresentation would cause injury to Winburn.

Both parties agree that the correct law is set out in AMI3d 2217, which was given the jury. That instruction reads as follows:

> In addition to compensatory damages for any actual loss that Winburn Tile may have sustained, it asks for punitive damages from the Dixon Company. Punitive damages may be imposed to punish a wrong-doer and to deter others from similar conduct. In order to recover punitive damages from the Dixon Company, Winburn Tile has the burden of proving either:

> First, that *Dixon* Ticonderoga *knew or ought to have known*, in light of the surrounding circumstances, that *its conduct would naturally and probably result in damage and that it continued such conduct in reckless disregard of the consequences from which malice may be inferred*; or

> Second, that Dixon Ticonderoga intentionally pursued a course of conduct for the purpose of causing damage;

> Or both.

> You are not required to assess punitive damages against

the Dixon Company, but you may do so if justified by the evidence. (Emphasis added.)

In referring to the first prong of AMI 2217 above, Dixon argues that, before punitive damages could be awarded, Winburn Tile had the burden to show Dixon knew or should have known that its deceit would cause Winburn injury, and Dixon continued its deceit in reckless disregard of the consequences. Dixon claims no evidence of such malicious knowledge or conduct was shown on its part. In sum, Dixon admits it had originally sold and shipped Winburn Tile saggers comprised of one mix, PT250, and later changed that formula or mix to PT250A without informing Dixon, but Dixon argues no evidence was introduced showing it intended Winburn any harm when making that change in formula. To the contrary, Dixon relates it offered evidence that it had some problems of thermal shock with its original PT250 formula, and it was merely trying to improve its product with the new PT250A mix. In reviewing the record, we believe there is strong evidence to support the theory that Dixon not only knew it had misrepresented its product to Winburn, but also it continued selling and shipping that defective product in reckless disregard of the consequences. That being so, malice could have been inferred, thereby entitling Winburn to the AMI 2217 and its request for punitive damages. *See Stein v. Lukas,* 308 Ark. 74, 823 S.W.2d 832 (1992); *see also Allred v. Demuth,* 319 Ark. 62, 890 S.W.2d 578 (1994).

Winburn Tile had been using saggers purchased from two companies, Ferro Corporation and Shenango Corporation, when Dixon approached Winburn about buying its saggers, which were composed of the PT250 formula. Winburn began purchasing Dixon's product in August 1987, and carefully monitored Dixon's first shipments to determine the quality was equal to that of Ferro's and Shenango's saggers. Dixon's second shipment in October 1987, revealed serious problems, but a replacement shipment was sent in January 1988, and no further problems were detected — at least not until 1989. Winburn, being satisfied with Dixon's saggers, used all saggers from the three companies interchangeably.

Unknown to Winburn, Dixon developed a new sagger formula, PT250A, and on September 29, 1988, its shipment to Dixon contained saggers composed of this new formula. Dixon did not disclose this change, and, in fact, Dixon's invoices to Winburn continued to reflect the saggers shipped contained the old PT250

formula.

In 1989, Winburn Tile learned the number of saggers it was using had dramatically increased, and it set out to determine the reason. It was not until February 1990, that Winburn discovered Dixon's saggers had laminations. Laminations are defects caused by air pockets in the product and those defects make the product less durable. The other two companies' saggers showed no signs of lamination.

When Winburn and Dixon could not resolve their differences, this litigation ensued. During discovery, Winburn learned for the first time, from documents produced by Dixon, that Dixon had changed its formula just prior to Dixon's September 1988 shipment. However, Dixon's invoices to Winburn continued erroneously to reflect shipments of saggers manufactured with the original PT250 mix.

Although Dixon contends it intended no injury to Winburn by Dixon's misrepresentation of formulas, our review of the record reflects ample evidence from which a jury could (and obviously did) find otherwise. In this connection, Dixon admitted that its policy was to discuss with customers any material changes which would have either a *positive* or *negative* impact on performance. As previously discussed, this was never done. Dr. Robert Moore, a ceramic engineer, testified there was more talc in the PT250A formula than the PT250 mix, but the risk of putting high amounts of talc into the sagger is that the sagger will weaken. He said that in testing for the softening temperatures for these products, samples generally are sent to the customers. Dixon knew very well that any valid test given the new sagger formula must be performed at the plant where it is to be used in order to evaluate how it works in those particular conditions. Nonetheless, it shipped the new formula saggers without any suggestion that plant tests be conducted. Dixon's knowing failures to comply with its own policies in these matters reflect a reckless disregard of consequences. The resulting problems should have been of little surprise. Besides the increase in the number of saggers Winburn incurred after the PT250 formula was changed to PT250A, Winburn paid a higher price per sagger, $3.25 to $4.00. And while Dixon discounts the advantages it derived from producing the PT250A, testimony was presented that other financial benefits were derived by Dixon from its change in formulas. In sum, we believe the jury had strong,

substantial evidence from which it could reasonably find Dixon continued and financially benefited from its deceitful conduct, and at the least, should have known its conduct would cause damage to Winburn.

In its second point for reversal, Dixon asserts the compensatory damages awarded by the jury were erroneous, and the trial court erred in denying Dixon a new trial for that reason. On review, the test in these circumstances is whether the jury verdict is supported by substantial evidence, giving the verdict the benefit of all reasonable inferences permissible under the proof. *Williams* v. *Ingram*, 320 Ark. 615, 899 S.W.2d 454 (1995). In determining on appeal whether the evidence is substantial, this court need only consider the evidence on behalf of the appellee and that part of the evidence that is most favorable to the appellee. *Id.*

Here, the damages awarded were for $99,682.45. The portion of that award which is specifically contested is $78,911.99, the total amount Winburn paid for the 19,279 saggers shipped and paid for after the August 1988 formula change. Dixon complains that the jury award erroneously assigned no value for any of the saggers it had shipped.

We first point out the settled rule that a properly qualified expert's opinion constitutes substantial evidence, unless it is shown that the expert's opinion is without reasonable basis. *Ford Motor Co.* v. *Massey*, 313 Ark. 345, 855 S.W.2d 894 (1993). To support its claim for compensatory damages, Winburn duly qualified Dr. Charles Venus as an economist who had reviewed Winburn Tile's calculation of losses. Venus testified that the actual use Winburn had of the new formula saggers in manufacturing tile amounted to one or two trips, although some saggers may have made it through three or four times. Even so, Venus stated, for practical purposes, Winburn received no value from the saggers. In addition, we note that the trial court, without objection, gave an instruction on fixing the amount of compensatory damages and that instruction included the following element.

> [T]he difference at the time and place of Winburn Tile's acceptance of the saggers between the value of the saggers as accepted and the value they would have had if they had been as warranted.

Winburn presented evidence that saggers are bought and sold by

the truckload, and the last thing they wanted was another load of laminated or defective saggers. Dr. Moore gave his view that the PT250A saggers were unacceptable and were not suitable for use in the Winburn manufacturing process. The weight and value to be given expert witnesses lies within the exclusive province of the jury. It also is the jury's prerogative either to believe or disbelieve any witness. *Id.* Considering the foregoing testimony, we conclude the jury had substantial evidence before it.

For the reasons set out above, we affirm.