## OZARK GAS PIPELINE CORPORATION *v.*
## ARKANSAS PUBLIC SERVICE COMMISSION

99-915 29 S.W.3d 730

Supreme Court of Arkansas
Opinion delivered November 9, 2000

*Wright, Lindsey & Jennings LLP*, by: *N.M. Norton*, for appellant.

*Lee McCulloch*, for appellee.

ROBERT L. BROWN, Justice. This case involves the assessment of the *ad valorem* property tax by the Tax Division of the appellee Arkansas Public Service Commission (APSC) in 1995 and 1996, and specifically raises the question of whether $20.8 million in exit fees should have been taxed. The property assessed was a natural gas pipeline owned by appellant Ozark Gas Pipeline Corporation which extends from Pittsburg County, Oklahoma, to White County, Arkansas. The pipeline was completed in 1982, and approximately sixty-five percent of it is located in Arkansas.

Originally, there were four partners who owned Ozark: Columbia Gulf Transmission Co. (Columbia), Tennessee Gas Pipeline Co. (Tennessee), USX Corp., and ONEOK, Inc. Ozark was formed in 1978 and began delivering gas through the pipeline in 1982. In 1982, Columbia and Tennessee entered into contracts with Ozark and obligated themselves for fifteen years to pay for fifty percent of the pipeline's capacity, whether they used the pipeline or not. Payments made under those contracts were $18.5 million annually. In 1993, the partners decided to put the pipeline up for sale. After soliciting bids in 1994, the partners and a buyer (a unit of

NGC Energy Resources, Inc.), entered into a purchase and sale contract on February 10, 1995. The contract valued Ozark's tangible pipeline assets at $24 million and an intangible asset, the exit fees, at $20.8 million, for a total purchase price of $44.8 million.

The exit fees were established to deal with the obligations of Columbia and Tennessee under the fifteen-year contracts with Ozark to use fifty percent of the pipeline's capacity. Those contracts were due to expire in February of 1997. Before the sale, Columbia and Tennessee had agreed with Ozark to settle the contract obligation by making lump sum payments. The agreement reached provided that Columbia and Tennessee would pay exit fees of $20,841,750. These exit fees had not been contemplated in NGC's bid of $24 million made in 1994. In addition, when Ozark and NGC entered into the purchase and sale contract on February 10, 1995, the Federal Energy Regulatory Commission (FERC) had not yet approved the lump sum agreement.

On May 1, 1995, Ozark and NGC closed the sale. In August of 1995, FERC approved the lump sum settlement agreement between Ozark and its two partners, Columbia and Tennessee. Prior to FERC approval, Columbia and Tennessee continued their monthly payments to Ozark. In September of 1995, Columbia and Tennessee paid $17 million to Ozark as the final payment of the exit fees.

In 1995, the Tax Division of APSC valued Ozark's property for *ad valorem* tax purposes. The valuation was based on the Tax Division's consideration of three statutory methods. *See* Ark. Code Ann. § 26-26-1607(b) (Repl. 1997). The weighted average of the three methods used yielded a value in 1995 of $44,093,606. Approximately sixty-five percent of that amount was allocable to Arkansas's portion of the pipeline. In 1996, the valuation by the Tax Division of the same property was based entirely on the cost method, which is one of the three statutory methods under § 26-26-1607(b). At that time, Ozark's book value was $44.7 million, and that was the value APSC used. The precise unit value placed on Ozark by the Tax Division for 1996 was $44,701,512, which represented an increase over the 1995 valuation. The sixty-five percent factor for property located in Arkansas was then applied to these values. The statutory twenty percent of value factor was next applied to determine assessed value, and that value was apportioned

among the affected counties for the application of the county millage.

Ozark filed a petition for review in which it objected to the Tax Division's valuation of its property for 1995 and 1996. It alleged that the Tax Division's values were too high and did not reflect the true market value or actual value of its property, as required by Ark. Code Ann. § 26-26-1605 (Repl. 1997). Moreover, Ozark contended that the valuations were not done in accordance with the methods for determining value set out in § 26-26-1607(b).

On June 5, 1997, the Administrative Law Judge conducted a hearing and invalidated the 1995 and 1996 valuations. In doing so, the ALJ found that the exit fees were intangible property and had been wrongfully included for valuation purposes. The APSC, on review, reversed the findings of the ALJ and approved the decisions of its Tax Division. Ozark petitioned for review by the Pulaski County Circuit Court, and the circuit court affirmed the order of the APSC. The matter was then appealed to the court of appeals, and that court certified the case to this court because the appeal involved a conflict in our statutes. We accepted certification.

## I. Scope of Review

As an initial matter, Ozark urges this court to engage in a *de novo* review of the APSC's order because it is an order deciding a question of law. We disagree that our standard of review is *de novo*.

The General Assembly has provided the applicable standard of review of an APSC order by an appellate court:

> (3) The finding of the commission as to the facts, if supported by substantial evidence, shall be conclusive.
>
> (4) The review shall not be extended further than to determine whether the commission's findings are supported by substantial evidence and whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or of the State of Arkansas.

Ark. Code Ann. § 23-2-423(c)(3) and (4) (Repl. 1997). Further-more, this court has held that it is not within the province of the courts of this state to assess property, but only to review those assessments. *St. Louis-San Francisco Railway Co. v. Arkansas Public Service Comm'n,* 227 Ark. 1066, 304 S.W.2d 297 (1957). The bur-den is on the person or entity protesting the assessment to show that the assessment is manifestly excessive, clearly erroneous, or confis-catory. *Tuthill v. Arkansas County Equalization Bd.,* 303 Ark. 387, 797 S.W.2d 439 (1990).

Accordingly, we will look to whether the findings of the APSC are supported by substantial evidence.

## II. The 1995 Assessment

For its first point, Ozark claims that the 1995 assessment was erroneously made because the Tax Division determined value with-out reference to the actual sale of the pipeline, which, it contends, was in the amount of $24 million. Ozark concedes that the sale did not actually close until May of 1995. It urges, however, that Ark. Code Ann. § 26-26-1602 (Repl. 1997), does not require that all property be assessed as of January 1 of each year. Instead, according to Ozark, the statute requires that companies report what the value of their property was as of that date. Ozark further urges that Ark. Code Ann. § 26-26-1607 (Repl. 1997), authorizes the Tax Divi-sion to consider other information in addition to the reports filed by the taxpayer. It concedes that property must be valued as of a definite point in time and that any specific cut-off point may be arbitrary, but it argues that to exclude a sale in the market place such as Ozark's sale of its assets to NGC in the amount of $24 million, as a means of determining value, is arbitrary.

Ozark also contends that the Tax Division erred by giving ten percent weight to the stock-and-debt method for deciding value under § 26-26-1602 because the pipeline was merely a partnership at the time of the assessment and had no publicly traded stock. If the stock-and-debt method had not been used, but instead its ten percent weight had been split between the other two methods, the 1995 valuation would have been $3 million lower, and the assess-ment would have been some $400,000 less than the figure arrived at by the Tax Division, according to Ozark. Finally, Ozark argues that

the Tax Division erred when it did not consider future income because in 1995 it was known that the Columbia-Tennessee contracts would end in less than two years and Ozark's income would substantially decrease.

In response, APSC explains how it reached the 1995 value for Ozark's property, using the three methods prescribed by § 26-26-1607(b). According to APSC, the cost approach yielded a value of $50.7 million and was assigned a weight by the Tax Division of thirty percent. The stock-and-debt method under the statute yielded a value of $73 million and was weighted at ten percent. And the income approach yielded a value of $35.9 million and was given a weight of sixty percent. The resulting unit value, using the three methods, was $44,093,606.

APSC further explains that it did not recognize the actual sale of the pipeline to Ozark, which sale closed on May 1, 1995, because Arkansas statutory law requires the company to report to the Tax Division "the amount, kind and value of the property as of January 1st next preceding the filing of the annual statement," and that all property be valued "according to its value on January 1." Ark. Code Ann. § 26-26-1602(b)(2) (Supp. 1997). APSC also notes that there was no reason for the Tax Division to extend the statutory window beyond January 1, 1995, and to accept Ozark's position that its value had decreased to $24 million.

Moreover, APSC emphasizes that the Ozark-NGC sale agreement stated on its face that the sale price was $44.8 million not $24 million. There were other references by NGC to the fact that the sale price was $44.8 million. NGC stated in an internal memo on February 17, 1995, after the February 10, 1995 contract, that Ozark had been acquired for $44.8 million. NGC also remarked in its annual report to stockholders that the property, plant, and equipment of Ozark had been purchased for $44.8 million. Finally, it was reported in Moody's Industrial Manual and NGC's 1995 annual report to the Securities and Exchange Commission that Ozark had been acquired for $44.8 million. Because of these facts, APSC maintains that its 1995 assessment of Ozark was not only very much in line with statutory requirements under § 26-26-1607(b) but that its determined value for 1995 ($44,093,606) approximated the actual sale price to NGC of $44,800,000. Finally, APSC claims there would be significant confusion if the Tax Division disregarded

the January 1 statutory directive and had varying cutoff dates for the multiple companies it assessed.

We turn then to the applicable statutes relating to assessment of utilities. The Tax Division of the APSC is authorized by statute to assess the natural gas pipelines in Arkansas, including Ozark. Ark. Code Ann. §§ 26-26-1601(1) and 26-26-1602(b)(1) (Repl. 1997). Statutory law also provides how that assessment is to be made:

> Each such company doing business or authorized to do business in Arkansas and owning or having control of property, or owning or having control of property in Arkansas, shall, through its owner, president, secretary, general manager, or agent having control of the company's affairs in this state, *on or before March 1* of each year, make a statement in writing to the division showing all property subject to assessment and taxation in this state. The statement shall truly show the amount, kind, and value of the property *as of January 1* next preceding the filing of the annual statement.

Ark. Code Ann. § 26-26-1602(b)(2) (Repl. 1997) (emphasis added).

In *Central & S. Companies, Inc. v. Weiss*, 339 Ark. 76, 3 S.W.3d 294 (1999), this court explained its rules for statutory construction:

> As a guide for our review, we look to the rules of statutory construction. The basic rule of statutory construction is to give effect to the intent of the legislature. *Ford v. Keith*, 338 Ark. 487, 996 S.W.2d 20 (1999). Where the language of a statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. We construe the statute so that no word is left void, superfluous, or insignificant; and meaning and effect are given to every word in the statute if possible. *Id.*

*Id.* at 80, 3 S.W.3d at 297. Applying these rules of construction to § 26-26-1602(b)(2), we note that the statute does not expressly state that a company's property must be assessed as of January 1. Nevertheless, the intent that that date is the cutoff point for valuation purposes is clear. APSC is persuasive when it contends that it assesses hundreds of companies a year, and that to have different

cutoff dates for each utility would be an administrative nightmare and would wreak havoc on the entire assessment process.

█ There is the further practical consideration that there was no guarantee that the sale between Ozark and NGC was going to be completed in 1995. The contract was signed on February 10, 1995, but the sale did not close until May. Any number of events could have occurred to delay the closing of the sale even beyond that date. Tax assessments must be certified to the counties by July 15. *See* Ark. Code Ann. § 26-26-1612 (Repl. 1997). Additionally, Ark. Code Ann. § 26-26-1605(a)(1) (Repl. 1997), requires the Tax Division to meet on the first Monday of March each year to determine assessments. It would be illogical to require the Tax Division to contemplate a sale in March that did not close until May. We conclude that § 26-26-1602(b)(2) provides for a determination of assessed value as of January 1 of each year. Accordingly, we find no fault in the APSC's procedure in this regard.

█ The next issue is whether the Tax Division erred in its use of valuation methods. Section 26-26-1607(b) provides that in determining a company's fair market value, the Tax Division shall *consider*:

(1) Original cost less depreciation, replacement cost less depreciation, or reconstruction cost less depreciation.
(2) The market value of all outstanding capital stock and funded debt, but where capital stock is not traded or capable of reasonably accurate determination, book values may be substituted.
(3) Operating income to be determined by the company's historical income stream with consideration to the future income stream.
(4) Other information that will assist in determining fair market value.

█ Ozark urges that the Tax Division erred in giving a ten percent weight to the stock-and-debt approach under § 26-26-1607(b)(2)(A). We first note that the ALJ acknowledged in his order that Ozark stock was not publicly traded but then stated that the Tax Division's methods of determining Ozark's value were not "per se inappropriate." Those methods, of course, included the stock-and-debt method for the 1995 assessment. At the hearing before the ALJ, the Tax Division's assistant director, Steven Switzer, explained that the stock-and-debt method derives from the theory that "the

assets of a firm on a balance sheet will equal its liabilities, and if you can determine the appropriate value for the liabilities, then by definition you have the value for the assets." In sum, Switzer explained the method as an analysis of the balance sheet of a company. Here, Ozark certainly had liabilities for valuation purposes, even though it did not have publicly traded stock. We conclude that the stock-and-debt method was a viable method for determining value.

Ozark also contends that the Tax Division did not appropriately consider the fact that the Columbia-Tennessee payments would end in 1997 and, thus, future income would greatly diminish. However, Ozark provides this court with no basis for its conclusion that the Tax Division did not appropriately consider historical income and future income stream, as § 26-26-1607(b) requires, other than its disagreement with the weight given to the income method.

■ We find no error in the methods used by APSC in its assessment of Ozark's property for 1995. We further conclude that the APSC properly considered the exit fees as part of the purchase price of Ozark.

### III. 1996 Assessment

Ozark next contends that the Tax Division erred in its assessment for 1996 ($44,701,512) because it again completely disregarded the sale to NGC as a means for determining value and only relied on the cost method of valuation in arriving at the assessment for that year. The company urges that if the Tax Division had given a thirty-five percent weight to the cost method and a sixty-five percent weight to the income method, this would have resulted in an assessment that was almost a million dollars less than the assessment it calculated. We disagree that the assessment was error. Ozark argues that the sale price was $24 million, but we have already concluded that the actual figure was $44.8 million with the inclusion of the exit fees. Witnesses for the Tax Division, including Steven Switzer, are convincing to us as they were to the APSC that the cost method was the preferred method for assessing value in 1996, particularly in light of the sale to NGC and the uncertainties associated with new ownership.

On this point, Ozark argues once more that Arkansas law requires the Tax Division to give consideration to historical *and* future income stream, but that it did not consider the fact that the Ozark income stream, would be "virtually obliterated" in February of 1997 when the capacity payments from Columbia and Tennessee ceased. APSC responds by first noting that when the Tax Division performed the 1996 valuation, it considered all three statutory methods under § 26-26-1607(b). It then decided to give one hundred percent weight to the cost-less-depreciation method because the resulting value approximated the amount for which the company was sold in 1995. Furthermore, for future income, APSC states that though it knew the income stream was guaranteed only through February 1997, it did not know how NGC's ownership would affect income. The fact that Ozark was in transition in 1995 and 1996 presented a highly unusual circumstance that made reliance on past income or predicting future income questionable and unreliable.

■ APSC's analysis appears entirely reasonable, and we affirm on this point.

### IV. Intangible Property

Ozark argues that the most serious flaw in the 1995 and 1996 assessments was the inclusion of exit fees in the amount of $20.8 million in the company's value. It contends that these assessments were incorrect because, at best, the exit fees were intangible property, and under Ark. Code Ann. § 26-3-302, intangible property is exempt from *ad valorem* taxes. It further claims that the exit fees were merely incidental to the sale, and that if the FERC had approved the exit fee settlement before February of 1995, the fees would have been paid by Columbia and Tennessee and taken out of Ozark by its partners, including Columbia and Tennessee, before the sale closed. Though Ozark readily admits that different sections of the Tax Code relating to utilities purport to tax intangible property, it contends that § 26-3-302 was enacted after those statutes and therefore is controlling. We disagree.

■ The rule is well settled that a general statute must yield when there is a specific statute involving the particular matter. *See Shelton v. Fiser*, 340 Ark. 89, 8 S.W.3d 557 (2000); *Bd. of Trustees for*

*the City of LR Police Dept. Pension and Relief Fund v. Stodola*, 328 Ark. 194, 942 S.W.2d 255 (1997). Section 26-3-302(a) is part of the Tax Code and deals generally with exemptions. It reads: "All intangible personal property in this state shall be exempt from all ad valorem tax levies of counties, cities, and school districts in the state." Utilities and carriers, however, have their own subchapter of the Tax Code. Several sections of that subchapter expressly provide that intangible property of utilities is assessed. For example, Ark. Code Ann. § 26-26-1606(b) reads:

> The division shall ascertain the value of all property, *tangible and intangible*, including good will, easements, and franchises, except the right to be a corporation, it being the purpose of this subchapter to include in the valuation every element that adds value to the property. (Emphasis added.)

Another section of the utilities subchapter describes the procedure for the Tax Division's assessment of a utility's property:

> (1) There shall be deducted from the true market or actual value of the entire property, *tangible and intangible*, ascertained as provided in this subchapter, the true market or actual value as ascertained from the information furnished by report or otherwise of all real and personal property of the company not used in its business as a public utility, and the remainder shall be treated as the true market or actual value of all its property, *tangible or intangible*, actually used or employed in its public utility business;
>
> (2) The division shall then ascertain and fix the value of the total utility operating property, *tangible and intangible*, in this state by taking such proportion of the true market or actual value of the entire operating property, tangible or intangible, of the company actually used in its public utility business ....

Ark. Code Ann. § 26-26-1611(1) and (2) (Repl. 1997) (emphasis added). Under the principle that the specific statute controls over the general, the sections relating to utilities for fixing value, which include tangible and intangible property, must control.

We further observe that § 26-3-302 was enacted in 1977. The utilities subchapter of the Tax Code was amended substantially in 1980. *See* Acts 1980 No. 9 and 10, Second Extraordinary Session. In 1980, no effort was made by the General Assembly to exclude or exempt intangible property from assessment for payment of *ad valorem* taxes. Moreover, Act 9 of 1980, which was codified in

part as § 26-26-1607(b), specifically included methods for assessing value. Those methods, as already discussed, included consideration of intangible property such as stock, debt, and future income. It reasonably follows that had the General Assembly desired to eliminate intangible property in calculating value, it would not have enacted Act 9 of 1980. On a related subject, we have held that the absence of a later change by the General Assembly of statutes interpreted a certain way by this court means our interpretations of the statutes remain the law. *Lawhon Farm Services v. Brown*, 335 Ark. 276, 984 S.W.2d 1 (1998). The same should be equally true of statutes that are clear but which have not been changed by the General Assembly.

There is, too, the point that Ozark is seemingly inconsistent in its arguments. It contends that the lump sum settlement payments, or exit fees, are intangible property and not to be assessed. At the same time, it urges that the Tax Division erred in not giving greater weight to the effect of the termination of the Columbia-Tennessee contracts on future income stream in both assessments. Income payable under the contracts also qualifies as intangible property; yet Ozark argues the merits of its impact on the assessed value of the company.

■ As a final point, we agree with APSC that the duty of its Tax Division is to "take into consideration the value of all the property of the company as a unit." Ark. Code Ann. § 26-26-1605(c) (Repl. 1997). Unit value, according to the APSC, includes the synergistic value of all properties which comprise the unit, and that embraces real, personal, tangible, and intangible property. We agree that the determination of unit value for a utility company must include the value of substantial accounts receivable such as the contemplated income which was termed "exit fees."

■ The dissent posits that the exit fees were not used in the business of providing utility services and because of this should not be included in determining market value under Ark. Code Ann. § 26-26-1611(1) (Repl. 1997). This was not an argument made by Ozark in its appeal, and we will not reverse on an issue not developed before this court. *See In Re Adoption of D.J.L.,* 341 Ark. 327, 16 S.W.3d 263 (2000). But, in addition, we are hard pressed to conclude that the income from the pipeline contracts which was represented in the exit fees was not "used" in Ozark's business. On

the contrary, it is clear to us that the exit fees were a definite asset of the company and an integral part of its unit value. As already stated in this opinion, the subsection following § 26-26-1611(1) specifically contemplates using tangible and intangible property in determining market value. *See* Ark. Code Ann. § 26-26-1611(2).

 We hold that the exit fees were properly assessed as property of Ozark.

## V. Substantial Evidence

As its final point Ozark claims that the Tax Division's 1995 and 1996 assessments are not supported by substantial evidence and, thus, its assessments must fail.

██ ██ Substantial evidence is evidence that a reasonable mind would accept as sufficient to support a conclusion and force the mind beyond speculation and conjecture. *Bohannon v. Arkansas State Bd. of Nursing*, 320 Ark. 169, 895 S.W.2d 923 (1995). In *Routh Wrecker Serv., Inc. v. Washington*, 335 Ark. 232, 980 S.W.2d 240 (1998), we said, "Substantial evidence is defined as 'evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond suspicion or conjecture.' " *Id.* (quoting *Esry v. Carden,* 328 Ark. 153, 942 S.W.2d 846 (1997)). When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *See Union Pacific R.R. Co. v. Sharp*, 330 Ark. 174, 952 S.W.2d 658 (1997).

██ ██ We disagree with Ozark's contention that substantial evidence is lacking. APSC emphasizes throughout its brief on appeal that its Tax Division considered the three methods for determining assessed value — cost less depreciation, stock-and-debt, and historical and future income — for purposes of both the 1995 and 1996 assessments. This is what the law requires under § 26-26-1607(b). Most of Ozark's arguments under this point are a rehash of arguments previously made. Suffice it to say that expert appraisers testified for both Ozark (Mark Andrews) and the Tax Division (Michael Goodwin) in the hearing before the ALJ. The APSC gave more credence to the testimony and analysis of Mr. Goodwin, which supported the methodologies considered and used by the

Tax Division in 1995 and 1996. Expert testimony qualifies as substantial evidence unless it is shown that the opinion is without reasonable basis. *Dixon Ticonderoga Co. v. Winburn Tile Mfg. Co.*, 324 Ark. 266, 920 S.W.2d 829 (1996); *Ford Motor Co. v. Massey*, 313 Ark. 345, 855 S.W.2d 897 (1993); *Wallace v. Williams*, 263 Ark. 702, 567 S.W.2d 111 (1978). We hold that substantial evidence supports the APSC's order.

Affirmed.

SMITH, J., not participating.

THORNTON, J., dissents.

RAY THORNTON, Justice, dissenting. The majority upholds the decision of the Arkansas Public Service Commission finding that a payment of $20.8 million dollars by customers of Ozark to get out of a contract for fifty percent of Ozark's pipeline capacity should be considered as part of Ozark's property actually used or employed in its public utility business. This penalty to escape from a contract to use or pay for fifty percent of Ozark's pipeline capacity in future years is referred to as an "exit fee." I cannot agree that such an exit fee to avoid future purchases is property that is currently employed in Ozark's public utility business, and I respectfully dissent.

There are two reasons why these exit fees should not be assessed as property used for public utility business. First, it should be noted that Ark. Code Ann. § 26-3-302, adopted in 1977, exempts all intangible property from *ad valorem* taxation. The statute reads as follows:

> (a) All intangible personal property in this state shall be exempt from all *ad valorem* tax levies of counties, cities, and school districts in the state.

> (b) The exemption provided in this section shall be applicable with respect to the assessment and taxation of intangible personal property on and after January 1, 1976, and no *ad valorem* taxes shall be assessed or collected on such property for any period after January 1, 1976.

*Id.*

In my view, this provision should determine the outcome of this case. Arkansas Code Annotated § 26-3-302 is both later and is more specific than other statutes suggesting that all property, both real and personal, tangible and intangible, are properly considered in assessing the value of property used or employed in Ozark's public utility business. The majority interprets these statutes as allowing intangible property to be taxable when it belongs to a public utility. I cannot agree.

More significantly, even accepting the majority's interpretation that the specific exemption of Ark. Code Ann. § 26-3-302 does not apply to property that is owned by a utility, the Commission's conclusion that exit fees are used or employed in Ozark's public utility business is untenable. The statutory framework upon which the majority relies to allow intangible property to be assessed has not been followed in this case. Arkansas Code Annotated § 26-26-1611 clearly and specifically prohibits the assessment of any property, real or personal, tangible or intangible, that is not used or employed in Ozark's public utility business. That statute states:

> The Tax Division of the Arkansas Public Service Commission shall assign or apportion the assessed value of the property of all persons, firms, companies, copartnerships, associations, and corporations which it is required to assess in the following manner:
>
> > (1) There *shall be deducted from the true market or actual value of the entire property*, tangible and intangible, ascertained as provided in this subchapter, *the true market or actual value* as ascertained from the information furnished by report or otherwise of *all real and personal property of the company not used, in its business as a public utility*, and the remainder shall be treated as the true market or actual value of all its property, tangible or intangible, actually used or employed in its public utility business;

Ark. Code Ann. § 26-26-1611(emphasis added). There is no showing that the revenues received as exit fees are used or employed in the business of providing utility services. The true market value of Ozark's property, real and personal, tangible and intangible, used or employed in its public utility business was established by an arm's length purchase and sale of property. The administrative law judge described the transaction in its order, and found that:

By late 1993 the owner-partners wished to sell the pipeline and in 1994 solicited bids therefor from prospective purchasers. Four bids were received, ranging in price from $23.5 million to $26 million. When the latter bid was hampered by lack of financing, the bid of NGC Energy Resources, a limited partnership, was accepted at $24 million.

Each of the four owner-partners had the right to match the winning bid, but none chose to exercise this option.

On February 10, 1995, NGC and the owner-partners signed an instrument entitled, stock and interest purchase and sale agreement, which, among other things, identified the tangible pipeline assets as having a value of $24 million.

Ultimately, the parties apportioned the value of the assets involved in this transaction as follows:

| | |
|---|---|
| Transmission Facilities | $14,400,000 |
| Truck Lines, Other | $9,600,000 |
| Fixed Assets | |
| Exit Fees | $20,841,750. |

This allocation was the result of parties' commitment in the agreement to negotiate in good faith on asset allocation, pursuant to section 338(h)(1) of the Internal Revenue Code and to make appropriate filings with the Internal Revenue Service.

The exit fees were not contemplated in the bids as submitted by the prospective buyers and arose as an issue after the parties had reached agreement on NGC's bid of $24 million.

It seems clear that the exit fees were not part of the real and personal, tangible or intangible, property used or employed by Ozark in its public utility business, and I would reverse the Commission's decision which is grounded upon the untenable conclusion to include exit fees.

I respectfully dissent.