The Honorable John Paul Verkamp State Representative 1405 W. Center Street Greenwood, AR 72936-3405
Dear Representative Verkamp:
You have presented the following questions for my opinion:
 (1) Is it proper for the Arkansas Assessment Coordination Department to set the estimated value of natural gas produced at the well head?
 (2) In light of the volatility of gas prices, is it proper for the Arkansas Assessment Coordination Department to establish the value of natural gas produced at the well head by using a one-year average price of natural gas produced and sold at the well head to determine the value of gas produced in the following year?
 (3) What authority exists for the Arkansas Assessment Coordination Department to make estimates of gas prices and to create an estimate by using a one-year average?
 (4) Should the Arkansas Assessment Coordination Department use a weighted average method by considering both the price and the volume sold during a specified period of time rather than an average price based upon 365 daily price levels?
 (5) Is it legally proper for the Arkansas Assessment Coordination Department to provide for a millage rollback/reduction and revenue reduction for those school districts receiving debt service supplement payments from the Department of Education?
RESPONSE
Question 1 — Is it proper for the Arkansas Assessment CoordinationDepartment to set the estimated value of natural gas produced at the wellhead?
It is my opinion that it is proper for the Arkansas Assessment Coordination Department to set the estimated value of natural gas produced at the well head.
The General Assembly explicitly granted the Department the authority over the assessment of the value of property that is subject to the advalorem tax, such as mineral interests (A.C.A. § 26-26-911). This authority is stated in A.C.A. § 26-24-102, as follows:
 The Arkansas Public Service Commission[1] shall have the full power and authority in the administration of the tax laws of this state to have and exercise general and complete supervision and control over:
 (1) The valuation, assessment, and equalization of all property, privileges, and franchises; and
 (2) The several county assessors, county boards of review and equalization, and other officers charged with the assessment or equalization of property taxes throughout the state, to the end that all assessments on property, privileges, and franchises in this state shall be made in relative proportion to the just and true value thereof, in substantial compliance with the law.
A.C.A. § 26-24-102.
The Department's authority to establish valuation methods is also reflected in A.C.A. § 26-24-107, which states:
 The Arkansas Public Service Commission[2] shall have the full power and authority in the administration of the tax laws of this state to:
 (1) Prescribe from time to time such general and uniform rules and regulations and issue such orders and instructions, not inconsistent with law, as may be deemed necessary respecting the manner of the exercise of the powers and discharge of the duties of any and all taxing officials; and
 (2) Require compliance with the commission's forms, rules, regulations, orders, and instructions.
A.C.A. § 26-24-107.
The authority of the Assessment Coordination Department was recently reiterated by the General Assembly in Act 1185 of 1999, codified at A.C.A. § 26-26-1901 et seq., in the context of property reappraisals. A pertinent provision of that Act states:
 (a) To carry out the provisions of this subchapter, the Assessment Coordination Department, as it deems necessary, appropriate, and consistent with the objectives of this subchapter, shall:
 (1) Develop and implement rules relating to reappraisal procedures to be followed by counties, specifying annual objectives with respect to the discovery, listing, and valuation of real property[3] for assessment purposes;
* * *
 (b)(1) Each county shall follow the reappraisal procedures established by the department and file a reappraisal management plan with the department no later than July 1 of the year preceding the commencement of the reappraisal.
A.C.A. § 26-26-1905(a)(1); (b)(1).
It should be noted that any valuation method established by the Department is subject to judicial review, under the provisions of A.C.A. § 26-24-106(b). That statute states in full:
 (a) The Arkansas Public Service Commission[4] shall have the full power and authority in the administration of the tax laws of this state to answer all questions that may arise in the construction of any statute affecting the assessment, equalization, or collection of taxes, in accordance with the advice and opinion of the Attorney General.
 (b) Such opinion and the rules, regulations, orders, and instructions of the commission prescribed and issued in conformity therewith shall be binding upon all officers, who shall faithfully observe and obey the same unless and until they are reversed, annulled, or modified by a court of competent jurisdiction.
A.C.A. § 26-24-106 (emphasis added).
The courts will give considerable deference to assessments based upon the methodology established by the Assessment Coordination Department. The Arkansas Supreme Court described this deference in Potlatch Corp. v.Arkansas, 311 Ark. 145, 842 S.W.2d 32 (1992), as follows:
 Because of the separation of powers doctrine, it is not within the province of state courts to assess property. Cook v. Surplus Trading Co., 182 Ark. 420, 31 S.W. 521 (1930). Courts can only review the assessments and reverse them and send them back to the executive department when they are clearly erroneous, manifestly excessive, or confiscatory. St. Louis — San Francisco Ry. Co. v. Ark. Public Serv. Com'n, 227 Ark. 1066, 304 S.W.2d 297 (1957). We have said that we will reverse property assessments only in the "most exceptional cases." Jim Paws, Inc. v. Equalization Bd. of Garland County, 289 Ark. 113, 710 S.W.2d 197 (1986). The burden of proof is on the protestant to show that the assessment is manifestly excessive or clearly erroneous or confiscatory.
Potlatch Corp. v. Arkansas, 311 Ark. 145, 151, 842 S.W.2d 32 (1992), quoting Tuthill v. Arkansas County Equalization Board, 303 Ark. 387,797 S.W.2d 439 (1990). See also Ozark Gas Pipeline v. Public Ser. Comm.,342 Ark. 591, 29 S.W.3d 730 (2000); IBM Credit Corp. v. Pulaski County,316 Ark. 580, 873 S.W.2d 161 (1994).
The guiding principle in determining whether the Department's valuation method is permissible is whether the method is designed to determine fair market value, pursuant to Article 16, § 5 of the Arkansas Constitution. A.C.A. § 26-26-303; Potlatch, supra. However, the Arkansas Supreme Court has noted that "[w]ith respect to standards for determining value of property to be assessed, there is no single or "proper" assessment method to be presented. All concede that there are various ways of going about assessing the value of property." Potlatch, 311 Ark. at 150. The courts will be unwilling to overturn the Department's valuation method unless the evidence presented establishes that the valuation method is unrelated to market value. Id.
Given the multiple statutory grants of authority to the Assessment Coordination Department concerning assessment methodologies, as well as the considerable deference given by the courts to the Department's assessment methodologies, it is clear that under Arkansas law, the Assessment Coordination Department does have the authority to set the estimated value of natural gas produced at the well head.
Question 2 — In light of the volatility of gas prices, is it proper forthe Arkansas Assessment Coordination Department to establish the value ofnatural gas produced at the well head by using a one-year average priceof natural gas produced and sold at the well head to determine the valueof gas produced in the following year?
It is my opinion that the Assessment Coordination Department's use of a one-year average is not, on its face, contrary to Arkansas law. As discussed in response to Question 1, the Department has broad authority under Arkansas law to choose its valuation methods. Pursuant to this statutory authority, as discussed in response to Question 1, the Department has enacted rules and regulations that incorporate the one-year average method. See Assessment Coordination Department Rules and Regulations, Chapter 5, Rule 5.1, "Valuation Guides and Forms," incorporating by reference the Arkansas Assessors' Real Estate Cost Manual, which sets forth the one-year average formula.
As noted in response to Question 1, the Arkansas Supreme Court has acknowledged that various property valuation methods may accomplish the goal of determining appropriate property values, in accordance with Article 16, § 5 of the Arkansas Constitution. The courts will uphold the Department's chosen valuation method unless the party challenging the methodology can produce factual evidence that the assessment is manifestly excessive, clearly erroneous, or confiscatory. Potlatch,supra.
It is my understanding that the Assessment Coordination Department adopted the one-year average valuation methodology for gas produced at the well head at a time when that method resulted in maximum stability. It is my further understanding that the Department is currently reviewing its methodology to determine whether another approach might now reflect greater stability. I reiterate that the Department has broad authority to make this determination, and the courts will give considerable deference to the Department's chosen approach; they will reject that approach only if provided with evidence that the valuation method results in assessments that are manifestly excessive, clearly erroneous, or confiscatory. Id.
Question 3 — What authority exists for the Arkansas AssessmentCoordination Department to make estimates of gas prices and to create anestimate by using a one-year average?
See response to Questions 1 and 2.
Question 4 — Should the Arkansas Assessment Coordination Department use aweighted average method by considering both the price and the volume soldduring a specified period of time rather than an average price based upon365 daily price levels?
I am unable to opine in response to this question, due to its inherently factual nature. A determination of whether a weighted average method would be superior to a one-year average method would require a consideration of substantial factual evidence. The Attorney General is not authorized to engage in factual inquiries of this nature.
Question 5 — Is it legally proper for the Arkansas AssessmentCoordination Department to provide for a millage rollback/reduction andrevenue reduction for those school districts receiving debt servicesupplement payments from the Department of Education?
It is my opinion that the Arkansas Assessment Coordination Department's treatment of the debt service supplement payments will have some negative impact upon the benefit that was intended by the provision of debt service supplements, but that this impact does not as a matter of law negate that benefit. The ultimate impact of the formula must be considered in the context of the particular facts about each school district, which will be directly impacted by numerous other factors, including the operation of various other provisions of law.
You explain that your question arises out of a formula that is used by the Arkansas Assessment Coordination Department in the process of determining appropriate millage rate rollbacks under Amendment 59. The formula in question is used to calculate, for Amendment 59 purposes, the minimum millage required by Amendment 74 (establishing a uniform rate of tax on property, to be used for the maintenance and operation of schools).
Under the Department's formula, the debt service supplement payments that are received by a school district from the State Department of Education pursuant to A.C.A. § 6-20-303(7) are subtracted from the school district's required debt payment in order to determine a debt payment figure to be used for purposes of calculating the minimum required millage. The lower millage that results is, in turn, used to calculate the overall rollback under Amendment 59. See A.C.A. § 26-26-404 (Form Item 7). The formula in question is reflected on the form that is set forth at A.C.A. §26-26-403(c).[5] You argue that the deduction of the debt service supplement payment negates the purpose of this supplement and is therefore legally impermissible.
The primary problem in responding to your question is that of quantifying the benefit that was intended to be afforded by the debt service supplement payments under A.C.A. § 6-20-303(7), and calculating whether that benefit has been illegally negated.
The provisions of A.C.A. § 6-20-303(7) are part of the "Equitable School Finance System Act" of 1995 (as amended by Act 1220 of 2001). The statute states:
 "Debt service funding supplement" means the state financial aid provided to qualifying local school districts for the purpose of reducing existing debt service burdens and increasing the amount of local revenue available for maintenance and operations expenditures and calculated as follows: For each mill of eligible debt service millage required, the local school shall be provided a dollar amount of no less than fifteen dollars ($15.00) per average daily membership times the state wealth index[.]
A.C.A. § 6-20-303(7).
The language of the above-quoted provision indicates that the purpose of the debt service supplement payment is to "reduc[e] existing debt service burdens and increase[e] the amount of local revenue available for maintenance and operations expenditures." Although the debt service supplement payment itself is calculated using a specified dollar figure, the stated purpose of the payment does not mandate an ultimate resulting benefit that can be precisely quantified by a specified dollar figure. The stated purpose of "reducing existing debt service burdens and increasing the amount of local revenue available for maintenance and operations expenditures" could conceivably be satisfied by a range of figures. For this reason, it is not clear as a matter of law that this stated purpose would necessarily be negated by the Assessment Coordination Department's formula.
Nevertheless, it is true that under the Department's formula, the result of subtracting the debt service supplement payments from the school districts' required debt in order to calculate a minimum required millage for debt service does result in a lower Amendment 74 millage rate, and a greater possible Amendment 59 rollback under the formula set forth in A.C.A. § 26-26-404 (Form Item 7). It is therefore clear at a minimum that the Department's deduction of the debt service supplement payment will have some negative impact upon the benefit provided by the payment. What is unclear, however, is whether the intended benefit is actually negated to the extent of being legally impermissible.
The ultimate impact of any consideration of the debt service supplement payment will vary widely from school district to school district, because of the wide variance of size, wealth, and millage rates among the districts. These factors are directly impacted by various other provisions of law.
The various provisions of law that are pertinent to these factors, in addition to A.C.A. § 6-20-303(7) (concerning debt service supplement payments), are Amendment 74 and its enabling legislation, A.C.A. §26-80-201 et seq. (requiring a uniform rate of tax for the maintenance and operation of school districts); Amendment 59 and its enabling legislation A.C.A. § 26-26-401 et seq. (providing for a rollback in ad valorem tax rates if a property reappraisal would result in an increase of more than 10% in tax revenues for taxing units); and Amendment 79 and its related legislation, A.C.A. § 26-26-1901 et seq. (providing for a cap — and in some cases a freeze — on the increase in assessment values on existing property for ad valorem tax purposes). Each of these laws will have an effect upon the specific economic facts about each school district.
Moreover, the interaction of these laws is extremely complex and difficult to implement. Because of the myriad of contingent factual matters that could both impact upon this interaction and that could result therefrom for each school district, I cannot conclude as a matter of law that the Assessment Coordination Department's formula necessarily negates the intended benefit of the debt service supplement payment.
I recognize, however, that this formula could, depending on the facts of the case, have this effect as applied to particular school districts. In this regard, I note that this area of Arkansas law could benefit from substantial legislative clarification. I reiterate, though (as discussed in response to Questions 1 and 2), that under the Arkansas Supreme Court's current interpretation of the authority given to the Assessment Coordination Department, it will give deference to the Department's methodologies, and will not reject them without a substantial evidentiary basis for doing so. The burden will be upon the challenging party to provide such an evidentiary basis.
Assistant Attorney General Suzanne Antley prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
[1] The Assessment Coordination Department was originally a division of the Arkansas Public Service Commission. See A.C.A. § 26-24-101. That Division was separated from the APSC by Act 436 of 1997 and now operates as a principal department, rather than as an arm of the APSC. Act 436 of 1997 states:
 (a) The Assessment Coordination Division of the Public Service Commission is transferred by a Type 2 transfer as provided in § 25-2-105 to the Assessment Coordination Department.
 (b) For purposes of this subchapter, the Assessment Coordination Department shall be considered a principal department established by Act 38 of 1971.
Acts 1997, No. 436, § 2.
The reference in A.C.A. § 26-24-102 can therefore reasonably be interpreted as a reference to the Assessment Coordination Department.
[2] See Footnote 1, supra.
[3] Mineral interests are treated as real property under Arkansas law.See, e.g., A.C.A. § 26-26-1110, -1111, and -1112.
[4] See Footnote 1, supra.
[5] This section of the Code (A.C.A. § 26-26-403(c)) was not actually enacted into law by the General Assembly, but rather was added to the Code pursuant to the Assessment Coordination Department's authority under A.C.A. § 26-26-410 (which directs the Department to revise all forms pertaining the millage rates under Amendment 59 and directs that such forms be added to the Code). Given the Department's broad authority, discussed previously, the fact that this form was not enacted by the General Assembly does not lessen the legal validity of the form.