SLIP OPINION



Cite as 2017 Ark. App. 421

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-16-1033

| | |
|---|---|
| | Opinion Delivered September 6, 2017 |
| CAROLYN THOMAS, ADMINISTRATRIX OF THE ESTATE OF ALFRED THOMAS, SR., DECEASED<br><br>APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTH DIVISION<br>[NO. 60CV-13-3438] |
| V. | |
| CAROL C. MEADORS, M.D., AND LITTLE ROCK ANESTHESIA SERVICES, PLLC<br><br>APPELLEES | HONORABLE TIMOTHY DAVIS FOX, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Judge

Carolyn Thomas, administratrix of the estate of Alfred Thomas, Sr., appeals the grant of summary judgment in favor of Dr. Carol Meadors and Little Rock Anesthesia Services, PLLC. Thomas argues that she met her burden of meeting proof with proof and demonstrated a genuine issue of material fact as to causation. We disagree and affirm.

Alfred Thomas, Sr., underwent a revascularization procedure on 29 August 2011. After the surgery, Mr. Thomas exhibited cardiac instability and was admitted to the intensive care unit. He died three days later; the cause of death was listed as cardiogenic shock.[1]

---

[1]Cardiogenic shock is defined as "shock resulting from primary failure of the heart in its pumping function." *Dorland's Illustrated Medical Dictionary* 1691 (30th ed. 2003).

In a complaint filed in August 2013 and an amended complaint filed in January 2016, Carolyn Thomas, as administratrix of the estate of Alfred Thomas, alleged that the medical negligence of Dr. Carol Meadors and Little Rock Anesthesia Services, PLLC (collectively "Meadors"), was the proximate cause of Mr. Thomas's death.[2] Thomas alleged that Meadors (1) failed to properly and adequately perform a presurgical history and physical examination of Mr. Thomas, and (2) failed to fully acquaint herself with Mr. Thomas's medical history or to appreciate the seriousness of Mr. Thomas's ongoing heart conditions. According to the complaint, Mr. Thomas had multiple known comorbidities, including a history of ischemic heart disease, a history of congestive heart failure, decompensated heart failure, severe vascular disease, diabetes, atrial fibrillation, and a history of stroke. Thomas alleged that Meadors "knew or should have known that subjecting a patient with multiple sever[e] systemic diseases that were a constant threat to his life to prolonged anesthesia induced unconsciousness during a high risk invasive peripheral vascular surgery would pose an eminent threat to Thomas'[s] life." The complaint also alleged that Mr. Thomas experienced a blood pressure "crash" immediately after the general anesthesia had been administered, that a discussion on whether to proceed with the surgery lasted twenty-five mintues, and that this failure to act in a timely manner was negligence.

In April 2016, Meadors moved for summary judgment and identified the following undisputed facts: (1) Meadors induced Mr. Thomas's anesthesia on 29 August 2011; (2)

---

[2]Thomas also named Dr. Frederick Meadors and Cardiovascular Surgeons, PA, as defendants in her complaint and amended complaint. Cardiovascular Surgeons, PA, was granted summary judgment in June 2016, and a jury found no negligence on the part of Dr. Frederick Meadors. Thomas did not appeal either of those judgments.

immediately following induction, Mr. Thomas experienced an acute decompensation (drop in blood pressure); (3) the doctors inserted a Swan-Ganz catheter and began treating Mr. Thomas with vasopressors to increase his blood pressure; (4) Mr. Thomas's blood pressure eventually stabilized, and the doctors chose to proceed with the planned procedure. Meadors explained that in the complaint and amended complaint, Thomas had two primary criticisms of Mr. Thomas's medical care: (1) that Meadors failed to conduct an adequate physical examination of Mr. Thomas prior to the August 29 procedure and (2) that Meadors negligently failed to terminate the revascularization procedure after Mr. Thomas had experienced the acute drop in blood pressure immediately following the induction of anesthesia. However, Meadors asserted, neither of Thomas's identified experts, Dr. Timothy Beacham, a board-certified anesthesiologist, and Dr. Morton Rinder, a cardiologist, could state to a reasonable degree of medical certainty that this alleged negligence proximately caused Mr. Thomas's death. And without a qualified causation opinion, Meadors argued, Thomas could not maintain a prima facie claim for medical negligence, and Meadors was entitled to summary judgment as a matter of law. In support, Meadors cited the following excerpts from the doctors' depositions.

During Dr. Beacham's deposition on 5 April 2016, the following exchanges occurred:

Q: [A]re you going to testify that had any kind of different physical assessment or different preoperative course been taken, that it would have changed the outcome in this case in any way?

A: No, I will not do that.

. . . .

Q:     But you can't say, to a reasonable degree of medical certainty, that any of—doing these things that you say she failed to do would have changed anything?

A:     Correct.

. . . .

Q:     Both Plaintiff's cardiologist and cardiovascular surgeon have testified that they can't say, to a reasonable degree of medical certainty, that after induction, if Mr. Thomas had not undergone the remainder of the procedure, whether or not he would have still suffered the same injury.

A:     Sure.

Q:     Is that your testimony, as well, that you can't say, to a reasonable degree of medical certainty, whether or not he would have sustained the same injury after induction?

A:     Right. . . . [T]here's a degree of medical certainty that this patient would have woken up. Now, what condition the patient would have been in, I cannot say any further than that.

. . . .

Q:     You have mentioned several times this evening that upon the placement of the Swan-Ganz catheter and the recognition of the pulmonary artery pressure, you believe that Mr. Thomas would have woken up, correct?

A:     If the case had been stopped at that point?

Q:     Yes, sir.

A:     Based on information compared to previous records, yes.

Q:     Now, can you testify, to a reasonable degree of medical certainty, that Mr. Thomas would have been able to come off the ventilator?

A:     I cannot.

Likewise, during Dr. Rinder's deposition on 18 March 2016, the following exchanges occurred:

Q:     Can you state to a reasonable degree of medical certainty or probability that had those things [a preoperative physical examination] been done for Mr. Thomas, he would not have had the episode that occurred at induction in this case?

A:     I think he was less likely to.

Q:     Okay.  Can you state to a reasonable degree of medical probability that he would not have had the same event?

A:     I cannot.

. . . .

Q:     You mentioned this, and I think I might be getting on to paragraph 7 here, but after his decompensation during the surgery, you mentioned that they continued on obviously with the surgery, correct?

A:     Correct.

Q:     And is it your opinion that they should have halted the procedure at that point?

A:     Yes.

Q:     Is it your opinion that Mr. Thomas would have been able to wean off the ventilator had they halted the procedure at that point?

A:     I don't know.  . . .  I think he would have had a better chance of getting off the ventilator had they stopped the surgery earlier.

Meadors noted that, under the Arkansas Medical Malpractice Act, Thomas is required to show "[b]y means of expert testimony provided only by a qualified medical expert that as a proximate result thereof the injured person suffered injuries that would not otherwise have occurred."  Ark. Code Ann. § 16-114-206(a)(3) (Repl. 2016).  Meadors

also acknowledged that although causation is ordinarily an issue for the jury, it becomes a question of law when reasonable minds cannot differ. *Neal v. Sparks Reg'l Med. Ctr.*, 2012 Ark. 328, 422 S.W.3d 116. In this case, Meadors argued, both Dr. Beacham and Dr. Rinder were unable to state, to a reasonable degree of medical certainty, that Meadors's alleged negligence proximately caused Mr. Thomas's death, so Thomas had failed to meet the requirement of § 16-114-206(a)(3).

Thomas responded by contending that "Dr. Timothy Beacham and Dr. Alan Schneider [a defense expert] both state to a reasonable degree of medical certainty that had the surgical procedure been stopped immediately after induction that the decedent would have 'awakened' and that there is no known medical reason he could not have survived." In support, Thomas cites deposition testimony from Dr. Schneider given on 6 April 2016:

> Q:   But can we agree in terms of risk, and we remove the risk of the anesthetic agent and the stress of the surgery from his cardiovascular system, it, to a reasonable degree of medical certainty, should have increased his survivability?
>
> A:   I think that's a fair statement.
>
> . . . .
>
> Q:   What causes—you believe that he went into cardiogenic shock after the procedure was completed?
>
> A:   Well, while his heart tolerated the procedure, afterwards they were not able to maintain his blood pressure, so he had further deterior— wherever his heart was during the procedure, deteriorated further after the procedure.
>
> Q:   You mean after the surgical procedure has concluded, is your opinion is when he developed cardiogenic shock?
>
> A:   He was not in cardiogenic shock intraoperatively.

Thomas interpreted this testimony to mean that it was Dr. Schneider's opinion that "the risks to Thomas'[s] survivability increased by continuing the surgical procedure and his chances for survival decreased by the Defendants' failure to stop the procedure after induction of anesthesia and prior to incision." Thomas also cited an affidavit filed by Dr. Beacham on 16 May 2016, forty-one days after his deposition, in which Dr. Beacham declared the following:

12. The standard of care for an anesthesiologist performing anethesia services on a patient in an elective procedure, whose blood pressure decreases to a level that is below the level required for adequate organ perfusion levels without immediate correction in response to vasopressors, given Mr. Thomas'[s] ASA IV physical, is to stop the elective procedure.

13. Further, the standard of care for an anesthesiologist performing anesthesia services on a patient with an ASA IV physical status in an elective procedure, upon discovering that the patient has critically severe hypertension with a swan ganz catheter measurement, is to stop the surgical procedure.

14. Dr. Caroll [sic] Meadors, M.D.['s] failure to stop the elective revascularization procedure on Mr. Thomas prior to incision, given his ASA IV physical status, when his blood pressure dropped below levels required for adequate organ perfusion and the patient suffering with severe pulmonary hypertension, and given the uncertainty of the patient's physical ability to withstand the stress of anesthesia and the surgical procedure, was below the standard of care.

15. Dr. Carroll [sic] Meadors, M.D.['s] failure to stop the elective revascularization procedure after discovering that Mr. Thomas had critically severe pulmonary hypertension after the placement of the swan ganz catheter, was below the standard of care.

16. The failure of Dr. Carroll [sic] Meadors, M.D. to stop the elective revascularization procedure after Mr. Thomas'[s] blood pressure dropped below levels required for adequate organ perfusion and/or the failure to stop the elective revascularization procedure after discovering that Mr. Thomas had critically severe hypertension, lead [sic] to the cardiogenic shock, which caused Mr. Thomas'[s] death.

17. Had Dr. Carol Meadors, M.D. stopped the administration of the anesthetic agents immediately after stabilizing Mr. Thomas'[s] blood pressure and not proceeded with the revascularization surgery, Mr. Thomas['s] probability of awakened [sic] from the induction of anesthesia was highly likely to a degree of medical certainty.

18. Based on my review of the medical records, I am unaware of any medical reason Mr. Thomas should not have survived the induction of anesthesia and awakened if [the] procedure had been cancelled prior to surgical intervention.

Finally, Thomas again cited deposition testimony from Dr. Schneider, in which he said it was "more likely" that Mr. Thomas would have awakened if the procedure had been stopped after induction. When asked if there was any indication that Mr. Thomas would be off the ventilator, Dr. Schneider responded,

No. I'm saying that he would have awakened. The drugs would have worn off. In fact, we don't know, I mean, we really at this point don't know the—if that induction of anesthesia was enough to tip him over? Is it the continued operation that was enough or at what point—or is it—or was he tolerating everything even till the very end and his cardiogenic shock happened postoperatively. I mean, I think at this point it's tough to determine.

Thomas concluded that

[t]he point of both doctors' testimony is that had the procedure stopped, Thomas would have awakened, to a reasonable degree of medical certainty, and his chances of survival whether on the ventilator or not, were increased as opposed to his chance of survivability being decreased by continuing the procedure following induction. Plaintiff need not prove, as an essential element of their claim for medical negligence how long Thomas' [sic] would have survived once the procedure continued, as Thomas died without awakening.

In reply, Meadors contended that Thomas was essentially asking the circuit court to deny summary judgment because there is a question of fact as to whether Mr. Thomas "would have 'woken up' had the procedure been stopped after induction." However,

Meadors argued, Mr. Thomas did, in fact, wake up from anesthesia long enough to be extubated and breathe on his own, but had to later be reintubated due to his heart failure. Meadors cited the deposition testimony of Dr. Kim Klancke:

Q:     [O]nce he's stabilized, after the induction, and—and I call it a "crash," but the dip in his blood pressure once they stabilize him, would you agree with me that had they stopped the procedure, it's more likely than not that the patient could you [sic] have been awakened?

[Objection to form]

A:     I think the patient was awake, you know, at the end of the procedure, or at least they extubated the patient and was breathing on—on his own. He had just become unstable from a cardiac perspective and had pulmonary edema and he had to be re-intubated. . . . [B]ut I don't think "waking up" has anything to do with it, necessarily.

. . . .

Q:     [B]efore the procedure was over, to a reasonable degree of medical certainty, when the procedure was interrupted, is it your opinion that the patient would have awakened?

A:     My opinion is he would have done exactly what he did, regardless of the—of the surgery. I think if they'd have stopped the—the procedure, taken him up to the ICU on a ventilator and tried to extubate him a few hours later, I think he'd have exactly the same clinical course no matter what he did.

Meadors argued that Thomas had failed to meet proof with proof and instead relied on a "loss of chance" theory that is not recognized under Arkansas law. Meadors asserted that Thomas had mischaracterized Dr. Schneider's opinion and improperly relied on a supplemental affidavit executed by Dr. Beacham. Meadors also argued that, regardless of Dr. Beacham's affidavit, Thomas had not established that, but for the alleged breach, Mr. Thomas would have lived. Instead, Meadors contended, Thomas used terms such as

"survivability" and "awakening" to confuse the ultimate issue of causation and asserted a "loss of chance" doctrine that has not been adopted into Arkansas law. *See Holt v. Wagner*, 344 Ark. 691, 43 S.W.3d 128 (2001) (acknowledging the existence of the lost-chance theory of recovery, but declining to adopt the theory at that time).

At the commencement of a pretrial hearing on 6 June 2016, Meadors's motion for summary judgment was summarily granted by the circuit court. Thomas has now timely appealed to this court.

In reviewing a circuit court's grant of summary judgment, we need only decide if the granting of the motion was appropriate based on whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Edwards v. MSC Pipeline, LLC*, 2013 Ark. App. 165. The burden of sustaining a motion for summary judgment is always the responsibility of the moving party. *Id.* All proof submitted must be viewed in a light most favorable to the party resisting the motion, and any doubts and inferences must be resolved against the moving party. *Id.* When the proof supporting a motion for summary judgment is insufficient, there is no duty on the part of the opposing party to meet proof with proof. *Cash v. Lim*, 322 Ark. 359, 908 S.W.2d 655 (1995). However, once a moving party establishes a prima facie entitlement to the summary judgment by affidavits, depositions, or other supporting documents, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* When a motion for summary judgment is made and supported, an adverse party may not rest on the mere allegations or denials of its pleadings, but its response, by affidavits or

as otherwise provided, must set forth specific facts showing that there is a genuine issue for trial. Ark. R. Civ. P. 56 (2016).

To establish a prima facie case of negligence, the plaintiff must demonstrate that the defendant breached a standard of care, that damages were sustained, and that the defendant's actions were a proximate cause of those damages. *Union Pac. R.R. Co. v. Sharp*, 330 Ark. 174, 952 S.W.2d 658 (1997). Proximate causation is an essential element for a cause of action in negligence. *Clark v. Ridgeway*, 323 Ark. 378, 914 S.W.2d 745 (1996). Proximate cause is that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred. *Wal-Mart Stores, Inc. v. Kilgore*, 85 Ark. App. 231, 148 S.W.3d 754 (2004). This traditional tort standard requires proof that "but for" the tortfeasor's negligence, the plaintiff's injury or death would not have occurred. *Dodd v. Sparks Reg'l Med. Ctr.*, 90 Ark. App. 191, 204 S.W.3d 579 (2005).

Although proximate causation is usually a question of fact for a jury, where reasonable minds cannot differ, a question of law is presented for determination by the court. *Cragar v. Jones*, 280 Ark. 549, 660 S.W.2d 168 (1983). In medical–injury cases, it is not enough for an expert to opine that there was negligence that was the proximate cause of the alleged damages. *Kilgore*, *supra*. The opinion must be stated within a reasonable degree of medical certainty. *Id.* When a party cannot present proof on an essential element of his claim, the moving party is entitled to summary judgment as a matter of law. *Sanders v. Banks*, 309 Ark. 375, 830 S.W.2d 861 (1992).

For her first point on appeal, Thomas argues that the circuit court erred in granting summary judgment because she had established a prima facie claim for medical negligence. She urges that her complaint and the opinions of her two experts, Dr. Beacham and Dr. Rinder, established the applicable standard of care, Meadors's failure to act in accordance with that standard, and that such failure was the proximate cause of Alfred Thomas's death.

But the inquiry on appeal is not whether Thomas established a prima facie case of medical negligence but whether Meadors established a prima facie entitlement to summary judgment in her motion. Thomas acknowledges the appropriate standard in her brief and in her second point on appeal argues that she met proof with proof in responding to Meadors's motion for summary judgment and demonstrated the existence of a material issue of fact regarding causation.

On this point, Thomas cites Dr. Beacham's affidavit and argues that according to Dr. Beacham (1) it was below the standard of care for Meadors to proceed with the surgery after Mr. Thomas experienced an acute decompensation after induction of anesthesia; and (2) if the procedure had been halted, Mr. Thomas's "probability of awaken[ing] from the induction of anesthesia was highly likely to a degree of medical certainty." She also cites an affidavit filed by Dr. Rinder on 20 May 2016 (after Thomas's response to the motion for summary judgment had been filed) and specifically to paragraph 24 of the affidavit, which states:

> The failure of Dr. Carol Meadors, to stop the elective revascularization procedure after Mr. Thomas'[s] blood pressure dropped below levels required for adequate organ perfusion and/or the failure to stop the elective revascularization procedure after discovering that Mr. Thomas had critically

severe hypertension, contributed to the cardiogenic shock, which caused Mr. Thomas'[s] death.

In response, Meadors argues that the circuit court did not err in granting summary judgment because Thomas failed on her burden of proof. Neither of her expert witnesses could opine to a reasonable degree of medical certainty that Mr. Thomas would have lived but for the alleged negligence of Meadors. Instead, Dr. Rinder stated that he did not know if Mr. Thomas could have been weaned off the ventilator, said that any opinion on the subject was "speculative," and stated only that Mr. Thomas "would have had a better chance of getting off the ventilator." Likewise, Dr. Beacham opined that if the surgery had been halted, Mr. Thomas "should have woken up," but he could not testify that the ultimate outcome would have been any different. Meadors contends, as she did below, that the issue is not whether Mr. Thomas would have awakened from anesthesia, which he did, but whether he would have ultimately survived, and that no expert witness could provide such an opinion.

We agree that Thomas has failed to meet proof with proof on the issue of causation. The expert testimony cited by Thomas fails to clearly articulate that Meadors's negligence was the proximate cause of Mr. Thomas's death; instead, Dr. Beacham opined that Mr. Thomas's awakening from the anesthesia was more likely if the surgery had been stopped, but the issue is whether he would have lived, not whether he would have "awakened." Dr. Rinder opined that continuing with the procedure "contributed to the cardiogenic shock," but the presence of a contributing factor is not synonymous with proximate cause. *See Neal*,

13

*supra.* We conclude that Thomas's expert testimony failed to establish proximate cause and was therefore insufficient to defeat summary judgment.

Affirmed.

GRUBER, C.J., and ABRAMSON, J., agree.

*McKissic & Associates, PLLC*, by: *Gene E. McKissic, Sr.*, and *Jackie B. Harris*, for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Michelle L. Browning*, *Jason Browning*, and *Graham Talley*; and *Anderson, Murphy & Hopkins, L.L.P.*, by: *Mark D. Wankum*, for appellees Carol Crittenden Meadors, M.D., and Little Rock Anesthesia Services, P.L.L.C.